## Farley et al. v. Commonwealth.
### (Decided April 23, 1937.)

R. L. POPE and J. O. BAKER for appellants.

B. M. VINCENT, ATTY. GEN., and J. J. LEARY, ASST. ATTY. GEN., for the Commonwealth.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

On Tuesday, February 11, 1936, Jess Farley, aged 29, and Tede Farley, aged 35, had a shooting affray with Thomas Thompson, aged 56, in which Thompson was instantly killed. The above-named Farleys were jointly charged by indictments with his murder. They were tried together under that indictment on August 28, 1936. Jess Farley was convicted of murder, his punishment fixed at life imprisonment; and Tede Farley convicted of manslaughter, and his punishment fixed at 21 years' imprisonment. They have prosecuted a joint appeal.

The older of these Farleys is certainly named "Theodore," for he so signed his name to affidavits in this record, but he was indicted as "Tede" Farley, and no effort was made to have that corrected. He is usually referred to as Tede Farley in the record, but he is also referred to as "Teddy," "Ted," and "Theo," but all these names referred to one and the same man.

### Feeling Between the Parties.

Thompson had married a sister of Tede Farley. Johnny Thompson, a son of the deceased, on March 17, 1935, had killed his uncle, Andrew Farley, a brother of Tede Farley. Johnny Thompson was on February 11, 1936, in jail awaiting trial, and was on April 16, 1936, convicted and given a death sentence for the murder of Andrew Farley. See Thompson v. Com., 266 Ky. 529, 99 S. W. (2d) 705. The appellants were expected to testify against Johnny Thompson on that trial and Thomas

Thompson for him. Thomas Thompson was expected to testify against Jess Farley on the trial of a charge pending against Jess Farley, so there was bad feeling between these parties. These Farleys and Thompson were evidently looking for each other, hence this has much the appearance of a mutual combat; the object of the combattants being to rid themselves of undesirable brothers-in-law and hostile witnesses. The evidence shows Thomas Thompson was reputed to be a dangerous man and 29 year old Jess Farley admitted on the stand that he (Jess) had previously been convicted of murder.

### The Fatal Meeting.

When they met about 9 a. m. on the fatal day, Thomas Thompson and his 15 year old son, Monroe Thompson, so it is claimed, were on their way to Black Mountain, and the Farleys claim they were coming from the direction of Black Mountain. There is some evidence that when they saw the Thompsons the Farleys stopped and held a sort of consultation in the roadway, after which they advanced on the Thompsons; Tede Farley continuing in the roadway wherein Thomas Thompson was traveling, and the other Farleys turning slightly aside and walking in a path on the bank adjoining the road. Nothing was said. In grim and watchful silence the two bands approached and began to pass each other. First Jess Farley passed, then Johnny Farley, then Albert, and Tede brought up the rear. About the time Tede Farley and Thomas Thompson met and were stepping past each other, Jess Farley raised his gun, and Tede Farley and Thomas Thompson, each of whom was armed with a shotgun, fired at each other. Tede Farley was so wounded that his left arm had to be amputated between the shoulder and the elbow. As best we can determine from the meager evidence, Tede Farley was struck in the back part of his upper left arm. Thomas Thompson was struck in the back part of his right thigh by a load of shot moving to his right, according to the evidence. Jess Farley, who was front man of the Farley party, had gotten slightly apast and was behind and above Thomas Thompson, and just about the same time that Tede Farley and Thompson exchanged shots, Jess Farley, who was armed with a high-powered 30-30 rifle, began shooting at Thomas Thompson and shot him four or five or possibly more times; the shots entering

the back and left side of Thompson, going through his body, and killing him instantly.

There is not much conflict about the main evidence in the case, but it is contended for the Farleys that Tede Farley never fired a shot, that Thomas Thompson fired the first shot, and that Jess Farley was shooting in self-defense; while it is contended for the commonwealth that Tede Farley fired the first shot. The defendants rely on a number of grounds for reversal which we shall now dispose of.

### The Instructions.

The court instructed the jury as follows:

"If the jury shall believe from the evidence to the exclusion of a reasonable doubt that in Harlan County, State of Kentucky, and before the finding of the indictment herein, the defendants, Jess Farley and Tede Farley, did unlawfully, willfully, feloniously and with malice aforethought, so shoot and wound the deceased, Thomas Thompson, with a gun or guns as that he, Thomas Thompson, died thereby, then you ought to find them or such one of them (*about whom you entertain such belief*) guilty of wilful murder as charged in the indictment and fix his or their punishment at death, or at confinement in the State Reformatory for and during his or their natural life, in the discretion of the jury, according to the proof."

The manslaughter instruction was drawn along the same general lines, and the self-defense instruction gave to each of the accused the right to shoot in defense of himself or his codefendant. There was no instruction on mutual combat, conspiracy, nor on aiding and abetting, though there should have been under this indictment and evidence. See Gilbert v. Com., 228 Ky. 19, 14 S. W. (2d) 194; Crenshaw v. Com., 227 Ky. 223, 12 S. W. (2d) 336; Ray v. Com., 230 Ky. 656, 20 S. W. (2d) 484, 66 A. L. R. 1297; Saylor v. Com., 210 Ky. 796, 276 S. W. 841; Van Wyk v. People, 45 Colo. 1, 99 P. 1009. Such instructions, however, would not have been beneficial to the defendants, since they, if given, would only have opened other avenues for the conviction of these men, therefore their omission was not prejudicial to the defendants.

In the instruction above we have inserted in italics and inclosed in parentheses certain words that defendants say should have been included but which were not, and the defendants urge that their omission was error, and argue that, with these words omitted, the jury could find either or both guilty under this instruction regardless of whether it entertained such belief as to their particular guilt or not.

The verdict returned completely refutes this argument. One was found guilty of murder and the other of manslaughter. So the jury was not confused by the instructions. The jury understood they did not have to fix the same punishment on each defendant.

The defendants had objected to all of these instructions and had moved the court to give the whole law of the case. If the court had done that, there would have been instructions on mutual combat, on conspiracy, and on aiding and abetting, but the omission of these was in no wise prejudicial to the defendants.

The instruction on self-defense, so they argue now, was defective because it only gave each of these defendants the right to kill in defense of himself and of the other. They now insist they should have had an instruction giving each of them the right to shoot in protection not only of each other and of themselves, but of their companions, Johnny Farley and Albert Farley. As to Tede Farley this is absurd. He swears he did not shoot at all, and after swearing to that he is in no position to ask the court to tell the jury what his rights would be if his testimony that he never fired a shot should be in fact untrue.

As to Jess Farley, here is what he says:

"Q. What did you shoot him for? A. To save my own life.

"Q. Did you have any other purpose in shooting him? A. No sir, Not a bit in the world.

"Q. Tell the jury if you in good faith believed he was going to shoot you with the shotgun when you shot him? A. What?

"Q. Tell the jury, Jess, if you in good faith believed that Thomas Thompson was going to shoot you with that shotgun he had in his hand when you shot him? A. I sure did. * * *

"Q. You was not trying to protect Tede against anything, just yourself? A. That is all."

Jess Farley is entitled to no instruction on defense of any one but himself under his testimony, and he got that.

### Insufficiency of the Evidence.

Appellants urge that the verdict is excessive and is not supported by the evidence. This is simply an argument that the jury believed the wrong set of witnesses. If that be true, it is most unfortunate for the defendants, for that was a question for the jury. The testimony of the witnesses is conflicting, and the jury could not believe all of them. There was evidence to support the jury's verdict, and when that appears the appearance of conflicting evidence is no cause for disturbing the jury's finding.

### Directed Acquitals.

Defendants have argued so strenuously that they were entitled to directed acquitals that we shall to some extent review the evidence and note the inferences probably drawn therefrom by the jury.

From the stopping of the Farleys and their huddled and hurried conference just before they advanced to the combat, the jury may have inferred the final details of and the signals for the combat were being agreed on, and that the ensuing shooting was according to their plan.

### Tede Farley Testified.

"Q. What was the first thing you noticed there was to be any trouble? A. First thing, I saw Jess raise his gun, just as we went to pass him. Thomas Thompson raised his gun and I threw up my arm this way."

From that the jury could infer that the act of Jess in raising his gun was the agreed signal for the slaughter to begin.

There was testimony Tede Farley's shotgun was the first gun fired, while there was the testimony of these four Farleys and two other eyewitnesses that Tede never fired a shot. Who fired first was a typical jury question, and the verdict shows the jury found Tede did shoot,

and having found that, it follows it found he shot first, for his left arm was shot in two by Thomas Thompson, so Tede could not have fired any shot other than the first one.

We think it well at this point to quote some of the testimony of the eyewitnesses as to the position of Tede Farley and the deceased at the time the shooting began.

In the testimony of Sampson Stout, a 15 year old colored boy, we find this:

"Q. How close was Thomas Thompson to Tede? A. Looked like he was past him."

This is from the testimony of Albert Farley:

"Q. Tell what happened. A. Whenever Ted came up like this he (Thompson) threw up his gun and shot Ted and then he turned and threw his shell out of his shotgun and turned and was putting another in looked like and looked right at Jess and Jess commenced shooting. * * *

"Q. How far do you think Mr. Thompson was from Ted when he threw up his gun and shot Ted. A. He was across the wagon road."

This is from the testimony of Tede Farley:

"Q. Where was you and him when he shot you? A. I went to raise up this way. * * *

"Q. How close did he get to you when he fired on you? A. I was just beside him. Him in one wagon track and me in the other. Well, I had just passed him, just a little. * * *

"Q. How far was that gun away from you when he actually fired it. A. Just like we was passing in a wagon road, him in one track and me in the other. I was fixing to step by him."

Appellants in their brief say:

"That had Tede Farley at that close distance, shot Thomas Thompson with a shotgun, some of the shots would have struck his limbs or body. The fact that they did not (so they contend) is enough to acquit him of this crime. The jury was not instructed nor was it justified in convicting him if he did not shoot, wound or help kill Thompson. It is but a straight

murder instruction with no aiding or abetting instruction or conspiracy charge."

With a single exception, the foregoing statement is correct, both as to law and facts, and that exception relates to the shotgun wounds on Thompson. Concerning such wounds there is but little evidence before us, and because of the pivotal importance of this evidence we shall discuss it in some detail.

### Did Tede Farley Shoot Thompson?

On page 144 of the transcript this appears:

"Counsel for defendants, R. L. Pope, at this time read to the jury the statements of Dezzie King and Claudie King from affidavit for continuance filed by defendants, as follows:

" 'We were each at the home of Thomas Thompson after he was shot that day and we saw and examined the overcoat which he had on at the time he is said to have been killed, and we know there were no shotgun holes in the coat anywhere and * * * we then began to look and examined his clothing and saw there were no shotgun holes in it anywhere. We are related to the Thompsons and if any relation to the Farleys we do not know it.' "

How this got in here we do not know, for the schedule calls for a copy of the entire record, yet there is nothing in the record to show the defendants had ever sought a continuance or that the attendance of Dezzie King and Claudia King had been desired or sought as witnesses at any time. Their names do not appear elsewhere in the record.

Be that as it may, it only amounts to this, that these witnesses say they examined certain clothing and found no shotgun holes in it. On the contrary, the jury saw and examined the overcoat, the sweater, the shirt, the pants, and the underwear, shown to have been worn by Thompson when he was killed. The jury had to find shotgun holes in them, else they would not have found Tede Farley guilty under these instructions. This clothing was put in evidence, but has not been brought here. A jury's verdict on the facts is rarely disturbed when there is any evidence to support it. This is always true when the supporting evidence is not brought here.

It is admitted Thomas Thompson was shot by Jess Farley; there was evidence he was also shot by Tede Farley; the jury has found he was shot by both of them. In such a situation the law will not stop to inquire which shot was the fatal one. See Bennett v. Com., 150 Ky. 604, 150 S. W. 806, 43 L. R. A. (N. S.) 419.

The judgment is affirmed.