Kimberly SPRINGER, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Alexandra Eades, Appellant,

v.

Commonwealth of Kentucky, Appellee.

No. 96–SC–502–MR.

Supreme Court of Kentucky.

April 22, 1999.

As Modified May 3, 1999.

Rehearing Denied Sept. 23, 1999.

Thomas M. Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant Springer.

Richard Hoffman, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant Eades.

A.B. Chandler, III, Attorney General, Frankfort, KY, Samuel J. Floyd, Jr., Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, for appellees.

COOPER, Justice.

Ernest Springer was killed by a single gunshot wound to his left temple while asleep in his bed during the early morning hours of May 21, 1995. His wife, Kimberly Springer, and his wife's sister, Alexandra Eades, were jointly charged with his murder. On the day of the murder, Eades confessed to police that she fired the fatal shot and Springer confessed to being an accomplice. At trial, Springer claimed she shot and killed her husband because of physical and sexual abuse which he had inflicted upon her, and because of his threat to sexually abuse her daughter. Eades denied any involvement in the killing. Eades was convicted as the principal and Springer as an accomplice to the murder. Each was sentenced to thirty years imprisonment. Both appeal to this Court as a matter of right. Ky. Const. § 110(2)(b). The claims of error are that (1) the appellants were not allotted the proper number of peremptory strikes; (2) their respective confessions should have been suppressed; (3) evidence of prior sexual acts by Springer should have been suppressed; (4) and (5) the jury was improperly instructed with respect to both defendants; (6) the evidence was insufficient to support Eades's conviction; (7) the trial judge improperly limited the scope of voir dire; (8) Springer's counsel was absent at critical stages of the proceedings; and (9) at sentencing, Springer was denied the domestic violence exemptions from KRS 533.060(1) and KRS 439.3401(4).

## I. PEREMPTORY STRIKES.

The trial judge seated one alternate juror and allotted nine peremptory strikes to the Commonwealth and a total of eleven peremptory strikes to the appellants, nine to be exercised jointly and one each to be exercised independently of the other. Appellants claim that they were entitled to at least twelve peremptory strikes. We conclude that they were entitled to thirteen.

Prior to September 15, 1990, RCr 9.40 provided in pertinent part as follows:

(1) If the offense charged is a felony, the Commonwealth is entitled to five (5)

peremptory challenges and the defendant or defendants jointly to eight (8) peremptory challenges....

(2) If one (1) or two (2) additional jurors are called, the number of peremptory challenges allowed each side shall be increased by one (1).

(3) If more than one defendant is being tried, the court may at its discretion allow additional peremptory challenges to each defendant.

Under this version of the Rule, the trial judge was granted substantial latitude in allocating (or not) additional peremptory challenges to codefendants. *E.g., Turpin v. Commonwealth*, Ky., 780 S.W.2d 619 (1989), *cert. denied*, 494 U.S. 1058, 110 S.Ct. 1530, 108 L.Ed.2d 769 (1990); *Smith v. Commonwealth*, Ky., 375 S.W.2d 819 (1964). Effective September 15, 1990, RCr 9.40 was amended as follows (underlined portions added, crossed-out portions deleted):

(1) If the offense charged is a felony, the Commonwealth is entitled to five (5) peremptory challenges and the defendant or defendants jointly to eight (8) peremptory challenges....

(2) If one (1) or two (2) additional jurors are called, the number of peremptory challenges allowed each side *and each defendant* shall be increased by one (1).

(3) If more than one defendant is being tried, [the court may at its discretion allow additional peremptory challenges to] each defendant[.] *shall be entitled to at least one additional peremptory challenge to be exercised independently of any other defendant.*

Subsection (1) was amended, effective October 1, 1994, to increase the Commonwealth's peremptory challenges to eight. Thus, the basic entitlement to peremptory challenges under RCr 9.40(1) is eight for the Commonwealth and eight for the defense. If more than one defendant is being tried, the defendants are entitled to a total of ten peremptory challenges: eight

to be exercised jointly pursuant to RCr 9.40(1), and one each to be exercised independently pursuant to RCr 9.40(3). If one or two additional (alternate) jurors are seated, the defendants are entitled to a total of thirteen peremptory challenges: nine to be exercised jointly pursuant to RCr 9.40(1) and (2); one each to be exercised independently pursuant to RCr 9.40(3); and an additional one each to be exercised independently pursuant to RCr 9.40(2):

RCr 9.40(1) — 8 (per side)
RCr 9.40(3) — 2 (one per defendant if tried jointly)
RCr 9.40(2) — 1 (one "each side" if alternate jurors seated)
RCr 9.40(2) — 2 (one "each defendant" if alternate jurors seated)
—
13 total.

The trial judge interpreted subsections (2) and (3) of the Rule as mutually exclusive, reasoning that the provision in subsection (3) allowing each defendant "one additional peremptory challenge to be exercised independently" applies only if no alternate jurors are seated, and that the provision in subsection (2) that the peremptory challenges for "each defendant shall be increased by one (1)" applies only if alternate jurors are seated. However, this interpretation ignores the fact that without subsection (3), each defendant does not have an "additional peremptory challenge to be exercised independently" which "shall be increased by one (1)" in the event alternate jurors are seated. Although the 1990 amendment of RCr 9.40 resulted in an awkward arrangement of the subsections of that rule, the intent of the amendment is clear. If more than one defendant is tried, each defendant is entitled to at least one additional peremptory challenge to be exercised independently; and if one or two alternate jurors are seated at that trial, those additional peremptories are increased by one each for a total of two per defendant.

◼ In *Kentucky Farm Bureau Mut. Ins. Co. v. Cook*, Ky., 590 S.W.2d 875 (1979), we held that an erroneous allocation of peremptory challenges is not sub-

ject to harmless error analysis, and that "reversal and a new trial should be awarded as a matter of law." *Id.* at 877. In *Thomas v. Commonwealth*, Ky., 864 S.W.2d 252 (1993), *cert. denied*, 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994), we reiterated this principle in the context of a criminal trial and held that, "[t]he rules specifying the number of peremptory challenges are not mere technicalities, they are substantial rights and are to be fully enforced." *Id.* at 259. Accordingly, this case must be reversed for a new trial because of the failure to allot appellants the proper number of peremptory strikes. Because the other issues raised by the appellants are likely to recur upon retrial, those issues will also be addressed in this opinion.

## II. CONFESSIONS.

The police arrived at the Springer residence at approximately 5:25 a.m. on the morning of May 25 and began their crime scene investigation, which was completed at approximately 8:10 a.m. Springer, Eades and a friend, Juan Cardonas, remained in the living room of the residence during this phase of the investigation. Although appellants claim they were denied access to family and friends during this period, the police ingress/egress log reflects and the trial judge found that Ruby Eades, mother of the appellants, was admitted to the residence at 6:10 a.m. and remained until 8:10 a .m., and that at least three other family members or friends were also present in the residence for shorter periods of time. At 8:10 a .m., both appellants left the residence and accompanied police officers to the police station.

At approximately 10:20 a.m., Springer was informed of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and gave a statement in which she denied any involvement in the death of her husband. At approximately 11:55 a.m., Eades was advised of her *Miranda* rights and was re-

quested to make a statement. She protested that this was not a good time to be interrogated, because she had been up all night drinking and smoking marijuana. However, she did not request counsel and did not specifically assert her right against self-incrimination. She then gave a statement in which she denied any involvement in the death of Ernest Springer. The police officers discussed among themselves the contents of the respective statements given by Springer and Eades and concluded that the sisters were withholding information. They decided to "run a ruse" on Eades.

There had been an unrelated homicide at the Springer residence several months earlier, following which a neighbor, Mr. Shide, had taken it upon himself to use his police scanner to intercept cordless telephone calls emanating from the Springer residence. He used a video recorder to tape the contents of these calls and furnished the police a copy of the videotape, which included recordings of Ernest Springer's voice. The recorded conversations were generally innocuous and contained nothing tending to incriminate the conversants in any criminal activity. Although the recordings had nothing to do with the investigation of Ernest Springer's death, the police officers decided to use the videotape to convince Eades that the Springer residence was being electronically monitored for criminal activity and, thus, that they already knew who had killed Ernest Springer.

At approximately 2:00 p.m., Eades was again advised of her *Miranda* rights. She was told that the police had been monitoring the Springer residence and Shide's videotape was played in support of that assertion. Several times during this interrogation Eades stated, "I can't tell you what you want me to tell you," or "I can't do it, it's going to hurt." Although Eades now claims that she was thereby invoking her right to silence, the officers believed that her statements only reflected her desire to protect her sister. They persisted

in their interrogation and, ultimately, Eades confessed that "I did it ... I killed Ernie." When Eades was asked to give a formal statement, she asked, "Do we have to do this now?" and expressed concern for her children. She was advised that someone had gone for her children, and that it would be best to make a formal statement while events were still fresh in her mind. Eades then gave a formal recorded statement in which she described shooting Ernest Springer at close range while Kimberly Springer stood nearby. After giving this statement, Eades was permitted to call her mother and was overheard to say, "I did it, I did it, I did it.... He wasn't nothing but trash."

At 3:52 p.m., Kimberly Springer was again advised of her *Miranda* rights and was told that Eades had given a statement. Springer then gave a recorded statement in which she related that Eades had killed Ernest Springer because of abuse, including sexual abuse, which Ernest had inflicted upon her (Kimberly) over a period of time.

### A. Voluntariness.

 Following a suppression hearing, the trial judge entered extensive findings of fact and conclusions of law in which she found that the totality of the circumstances indicated that both confessions were voluntary. Specifically, the trial judge found that neither appellant was intoxicated at the time of her confession; that their wills were not overborne by threats or by a denial of food, sleep, or access to friends and family; that neither was under arrest and both were free to leave the Springer residence and the police station at any time. This latter finding was supported by evidence that both Springer and Eades were advised by the officers at the conclusion of their respective first statements that they were free to leave. All of these findings were supported by substantial evidence presented at the suppression hearing and, thus, are conclusive. RCr 9.78. There was no error in admitting the confessions into evidence at trial. *Schneck-*

*loth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Ledbetter v. Edwards,* 35 F.3d 1062 (6th Cir.1994), *cert. denied,* 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995).

### B. Invocation of silence.

 Eades asserts for the first time on this appeal that the statements she made during her second interrogation, *i.e.,* "I can't tell you what you want me to tell you," and "I can't do it, it's going to hurt," amounted to an invocation of her right to remain silent. This issue was not preserved for the purpose of determining whether the admission of her confession at the first trial would be grounds for reversal and a retrial. A new theory of error cannot be raised for the first time on appeal. RCr 9.22; *Ruppee v. Commonwealth,* Ky., 821 S.W.2d 484, 486 (1991). However, since we have already determined that Eades must be retried, the issue is ripe for determination as to whether the confession is admissible at retrial.

 It is unnecessary to determine whether the statements in question constituted a revocation of Eades's previous waiver of her right to remain silent. *Compare United States v. Garcia–Cruz,* 978 F.2d 537 (9th Cir.1992), *cert. denied,* 508 U.S. 955, 113 S.Ct. 2453, 124 L.Ed.2d 669 (1993) (an equivocal or ambiguous invocation of the right to silence requires cessation of all interrogation except for questions designed to clarify the request) *with United States v. Ramirez,* 79 F.3d 298 (2d Cir.1996), *cert. denied,* 519 U.S. 850, 117 S.Ct. 140, 136 L.Ed.2d 87 (1996) (invocation of the right to silence after previous waiver must be clear); *cf. Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (invocation of the right to counsel after previous waiver must be by clear request before law enforcement officers are required to cease interrogation). The requirement stated in *Miranda, supra,* 384 U.S. at 473–74, 86 S.Ct. at 1627 and clarified in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d

313 (1975) that interrogation must cease once the suspect invokes his right to silence applies only to a custodial interrogation.

Miranda's commandment that questioning cease when a suspect indicates he intends to exercise his Fifth Amendment privilege does not apply, however, in situations ... where the defendant has available the easier and more effective method of invoking the privilege simply by leaving.... Law enforcement officers enjoy the same liberty as every other citizen to address questions to other persons. When those persons are not in custody or deprived of their freedom of action in any significant way, they have an equal right to ignore such questions and do not need the protection of Miranda.

*State v. Davis*, 305 N.C. 400, 290 S.E.2d 574, 585 (1982), *habeas corpus denied sub nom., Davis v. Allsbrooks*, 778 F.2d 168, 170 (4th Cir.1985); *cf. California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The trial judge's finding that neither appellant was in custody at the time of her confession is conclusive of this issue. RCr 9.78.

### C. Employment of a ruse.

■ Eades also asserts that her confession should have been suppressed because it was induced by use of Shide's videotape, which led her to believe that the police already had proof of her guilt. However, the mere employment of a ruse, or "strategic deception," does not render a confession involuntary so long as the ploy does not rise to the level of compulsion or coercion. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990). More specifically, a misrepresentation by interrogators of the strength of their case against the suspect does not render an otherwise voluntary confession inadmissible. *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir.1992), *cert. denied*, 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993). By inducing Eades to believe that they already knew who killed Ernest Springer, her interrogators did not lead her to consider anything beyond her own beliefs regarding her actual guilt or innocence. *Id.* "Of the numerous varieties of police trickery, ... a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary." *Id.*, citing W. LaFave & J. Israel, *Criminal Procedure* § 6.2(c), pp. 446–48 (1984); *United States v. Velasquez*, 885 F.2d 1076, 1088–89 & n. 11 (3d Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990).

### D. Use of illegally recorded conversations.

■ Finally, Eades claims, also for the first time on appeal, that her confession should have been suppressed because the acquisition and use of the recorded telephone calls violated both federal and state law. 18 U.S.C. § 2510, *et seq.;* KRS 526.020; KRS 526.060. As with her "invocation of silence" argument, *supra*, this otherwise unpreserved claim is ripe for determination with respect to the admissibility of Eades's confession upon retrial.

In *Brock v. Commonwealth*, Ky., 947 S.W.2d 24 (1997), the issue was whether the trial court had properly suppressed audio recordings of telephone conversations which tended to exculpate the defendant, but which had been obtained by private citizens in violation of KRS 526.020. We pointed out that the exclusionary rule applies only to evidence obtained in violation of a constitutional right, and that the Fourth Amendment to the United States Constitution and Section 10 of the Constitution of Kentucky apply only to state actions, not actions of private citizens. *Id.* at 29. Whether the provisions of the federal wiretapping act, 18 U.S.C. § 2510, *et seq.*, might have mandated suppression was an issue not raised in *Brock*. The pertinent provisions of that act are as follows:

*§ 2518(10)(a):* Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom. . . .

*§ 2515:* Whenever any wire or oral communication has been intercepted, no part of the contents of the communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

*§ 2511(1)(c):* [Any person who] intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection [shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5) ].

18 U.S.C. § 2510(11) defines an "aggrieved person" as a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed. Eades does not fall within this definition. Thus, § 2518(10)(a) has no application here.

Nor does § 2515 apply to Eades. In *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the United States Supreme Court held that evidence derived from an illegal wire tap is excluded only if offered against the person who was the target of the wire tap. In *Goldstein v. United States,* 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942), the Court interpreted provisions of the Communications Act of 1934, 47 U.S.C. § 605, which are almost identical to those contained in 18 U.S.C. §§ 2515 and 2511(1)(c). In *Goldstein,* the illegally intercepted messages were not introduced at trial, but were divulged to certain witnesses who were thereby induced to testify against the defendants. *Goldstein* held that even though divulgence to the witnesses of the unlawfully intercepted communications was in violation of the statute, such did not render the testimony so procured inadmissible against persons who were not parties to the communications.

These cases are in accord with the 400–year–old "mischief rule" of statutory construction that a statute must be read in the light of the mischief to be corrected and the end to be obtained. *Hayden's Case,* 3 Co.Rep. 72, 76 Eng.Rep. 687 (1584). That rule still applies to the construction of statutes in this jurisdiction, *City of Louisville v. Helman,* Ky., 253 S.W.2d 598, 600 (1952), as well as those enacted by the United States Congress. *Warner v. Goltra,* 293 U.S. 155, 158, 55 S.Ct. 46, 48, 79 L.Ed. 254 (1934); *Anderson v. Thompson,* 658 F.2d 1205, 1213 (7th Cir.1981). The mischief to be corrected by anti-wiretapping and anti-eavesdropping statutes is the acquisition of evidence against a suspect by an illegal search and seizure in the form of an unauthorized interception of his own private communications, and the use of that evidence against him in a subsequent proceeding. The use of such evidence against a person such as Alexandra Eades, who was not a party to the intercepted communications, is not precluded by 18 U.S.C. § 2510, *et seq.* and KRS 526.010, *et seq.* Nor do these statutes have any application to the admissibility of Kimberly Springer's confession. Although she was a resident of the home from which the communications were illegally intercepted, and her voice does appear occasionally on the vid-

eotape, the recording was not used to induce her confession and there is no evidence that she knew at that time that the videotape even existed, much less that it had been used to induce Eades's confession. Since Kimberly testified at trial that she, not Eades, shot and killed Ernest Springer, she could not have been prejudiced by the introduction of Eades's confession in which Eades took the blame and described Kimberly's participation as being that of a bystander/accomplice.

## III. PRIOR SEXUAL ACTS.

The Commonwealth introduced evidence of four specific instances of sexual conduct involving Kimberly Springer, which the appellants assert was irrelevant except to prove that she was a person of immoral character.[1] These instances of conduct included (1) evidence of an extra-marital relationship with another man; (2) evidence of a willingness to engage in a three-person sexual encounter with her husband and another man; (3) evidence of actual participation in a three-person sexual encounter with her husband and another woman; and (4) evidence identifying and characterizing the contents of a brown briefcase.

 We note at the outset that KRE 404(b)(1) has no application to this evidence. That Rule proscribes the introduction of evidence tending to prove a particular character trait "in order to show action in conformity therewith." Evidence of immorality would not tend to prove a propensity or predisposition to commit homicide. Thus, the evidence must be tested by the general rule of relevancy, *i.e.*, whether it has "any tendency to make the existence of *any fact that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." KRE 401. (Emphasis added.) A "fact that is of consequence to the determination of the

action" includes not only a fact tending to prove an element of the offense, but also a fact tending to disprove a defense. Relevancy is established by any showing of probativeness, however slight.

An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable than not. . . . It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable.

*Turner v. Commonwealth*, Ky., 914 S.W.2d 343, 346 (1996), *quoting*, R. Lawson, *The Kentucky Evidence Law Handbook* § 2.05, p. 53 (3d ed. Michie 1993) and Cleary, *McCormick on Evidence* 542–43 (3d ed.1984).

*A. Extra-marital relationship with Clark.*

 Kenneth Clark testified that Kimberly Springer began making sexual advances toward him approximately one month prior to her husband's death. On the first occasion, she was waiting for Clark when he arrived at the parking lot of his apartment. She wanted to know when they were going to go out together and suggested that they go to his apartment. Clark declined this offer, but the two kissed each other. Springer requested that Clark not tell her husband about this incident. On another occasion, Springer entered a bathroom while Clark was urinating and fondled his buttocks. Springer visited Clark's apartment on four or five occasions. On two or three of these occasions, they engaged in "flirtation" and mutual fondling, but not sexual intercourse. While at a bar with some other people just two nights before Ernest Springer's death,

---

1. Although none of this evidence pertained to Eades, she implausibly asserts that because she and Springer are sisters, the jury could have inferred that they inherited the same character flaws.

Kimberly Springer pulled Clark into the women's restroom where they embraced and kissed. In addition to this evidence, the prosecutor introduced evidence that Kimberly Springer was the beneficiary of approximately $55,000.00 in life insurance policies owned by her husband.

■ The prosecutor's theory was that Springer's motive in killing her husband was to free herself for other romantic interests while obtaining the benefits of his life insurance policies. Evidence that a defendant was romantically involved with another person is relevant to establish a motive to kill that defendant's spouse. *Chumbler v. Commonwealth*, Ky., 905 S.W.2d 488, 493 (1995); *Davis v. Commonwealth*, Ky., 795 S.W.2d 942 (1990); *cf. Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 34–35 (1998). Clark's evidence was admissible for this purpose.

*B. Three-person sex with Chandler.*

■ During her tape-recorded confession, Kimberly Springer described to the police specific instances of spousal abuse alleged to have been perpetrated against her by her husband. One such allegation was that he tried to force her to engage in three-person sex with himself and another man, Charlie Chandler.

Chandler testified in the Commonwealth's case-in-chief that in September 1994, he was watching television in the living room of the Springers' residence while Ernest and Kimberly were having sexual relations in the bedroom. Ernest called Chandler into the bedroom and invited him to join in the sexual activity. According to Chandler, Kimberly indicated no unwillingness to participate in this proposed three-person sexual encounter. In fact, Chandler testified that when he declined the offer and started to leave the bedroom, Kimberly called out to him, "Please don't leave, Charlie; it's alright."

Chandler's testimony of Kimberly's willingness to participate in this proposed sexual encounter was admissible to rebut her claim that this incident amounted to an act of sexual abuse perpetrated against her by her husband. It is immaterial that the evidence was offered during the Commonwealth's case-in-chief, since the assertion of sexual abuse had already been introduced during the playing of Kimberly's taped confession. The statements in the confession were admissible as admissions. KRE 801A(b)(1). Once introduced, the Commonwealth was entitled to refute those statements and was not required to wait until rebuttal, an opportunity which might never have occurred if Springer had chosen to rely on her taped statements instead of testifying in her own defense. Remember, in her taped statement, Springer not only accused the victim of being a batterer, she also accused Eades of being the murderer.

*C. Three-person sex with Girdler.*

■ In her taped statement, Springer also accused the victim of forcing her to engage in a three-person sexual encounter with an unnamed woman. Dr. Rosewater, the clinical psychologist who diagnosed Springer as suffering from "battered woman syndrome," testified that Springer had identified the female participant in this encounter as a woman named "Dawn." In rebuttal, the Commonwealth produced Dawn Girdler, who testified that she indeed participated in a three-person sexual encounter with Ernest and Kimberly Springer. She further testified that it was Kimberly, not Ernest, who solicited her participation in that encounter, that Kimberly did not appear to be under duress during the encounter, and that Kimberly afterwards proposed that they do it again on a future occasion. Girdler's testimony was properly admitted to rebut Kimberly's claim that her husband sexually abused her by forcing her to engage in three-person sex with himself and another woman.

*D. Contents of the brown briefcase.*

■ Police Chief Thomas Collins testified that at the conclusion of her taped

confession, Springer told him that the contents of a brown briefcase located at the Springer residence would prove all of her allegations of abuse. Springer executed a "Consent to Search" form and Police Sgt. Benny Johnson retrieved the briefcase and reviewed its contents. The contents consisted of a photograph album containing nude photographs of Kimberly Springer, a videotape depicting Ernest and Kimberly Springer engaging in explicit sexual acts, and certain sexual devices, which Johnson characterized as "marital aids."

In response to a motion in limine to suppress this evidence, the trial judge ruled that the evidence was relevant to disprove Kimberly's claim of sexual abuse, but that the probative value of displaying the contents of the briefcase to the jury was substantially outweighed by the danger of undue prejudice. KRE 403. Thus, Johnson was permitted to tell the jury what he found in the briefcase and to express his opinion that the briefcase did not contain evidence of sexual abuse, but rather evidence of "two consenting adults having fun." Both Springer and Eades claim that the introduction of this evidence was so highly prejudicial that it should have been suppressed in its entirety. Springer continues to claim on appeal that the contents of the briefcase prove her claim of sexual abuse.

■■■ The trial judge's compromise ruling was an appropriate solution to this dilemma. Springer claimed that the contents of the briefcase would prove her "battered woman" defense. The Commonwealth was entitled to prove otherwise. It is immaterial that Springer made her claim before trial rather than at trial. This evidence warranted an inference that if Springer made a false claim of abuse with respect to the contents of the briefcase, she might also be falsifying her other claims of abuse. Sgt. Johnson's descriptions of the sexual devices as "marital aids" and the activities portrayed in the videotape and photographs as "consenting adults having fun" were proper subjects of lay opinion, KRE 701, and were not prejudicial characterizations. Consensual sexual activity between a husband and wife is not evidence of an immoral character *per se*. If Springer believes that the contents of the briefcase prove her allegations of abuse, she can, upon retrial, withdraw her motion to suppress and introduce those contents in support of her defense. However, having claimed that the evidence proves her defense, she cannot prevent the Commonwealth from proving otherwise.

## IV. JURY INSTRUCTIONS/SPRINGER.

### A. *Intoxication.*

■■■■ There was evidence that Kimberly Springer consumed substantial quantities of alcohol, Valium and diet pills on the day and evening before her husband was killed. She asserts that this evidence of her drunkenness entitled her to an instruction on the defense of intoxication. KRS 501.080. However, evidence of intoxication will support a criminal defense only if the evidence is sufficient to support a doubt that the defendant knew what she was doing when the offense was committed. In order to justify an instruction on intoxication, there must be evidence not only that the defendant was drunk, but that she was so drunk that she did not know what she was doing. *Stanford v. Commonwealth*, Ky., 793 S.W.2d 112, 117–18 (1990); *Meadows v. Commonwealth*, Ky., 550 S.W.2d 511 (1977); *Jewell v. Commonwealth*, Ky., 549 S.W.2d 807 (1977), *overruled on other grounds*, *Payne v. Commonwealth*, Ky., 623 S.W.2d 867 (1981).

Kimberly testified that shortly before the killing, her husband had called her away from a party at a neighbor's residence and forced her to engage in oral sex with him; and that he also threatened to force Kimberly's thirteen-year-old daughter to engage in oral sex with him. (At the time, Kimberly's daughter was 600 miles away and was not expected to return to

Kentucky for several weeks.) Kimberly then returned to the neighbor's house and asked Alexandra to accompany her back to her residence to get a coat. On the way, Kimberly stopped at her pickup truck and retrieved a handgun she had borrowed earlier from her aunt. The two sisters had already entered the house when Alexandra pointed out that Kimberly did not even know how to fire the weapon. They left the house and walked down to the Ohio River where Alexandra test-fired the gun by firing a shot into the river. They then returned to the Springer residence. Kimberly testified that she walked into the bedroom, pointed the gun at her husband, and shot him. Although she testified at trial that she could not remember certain things that happened before and after the shooting, she did not claim that these lapses in memory were due to intoxication.

In addition, Dr. Rosewater, Springer's expert in support of her "battered woman syndrome" defense, testified unequivocally that Springer's consumption of alcohol and pills did not render her so intoxicated that she lacked intent or did not know what she was doing when she killed her husband. Rosewater testified that Kimberly told her "explicitly" that she was the one who pulled the trigger, not Alexandra Eades. In short, Kimberly's defense was not that she could not form the requisite intent to murder her husband because of intoxication, but that she killed him intentionally in self-protection because of what he had done to her and what he threatened to do to her daughter. Such evidence did not warrant an instruction on the defense of intoxication.

*B. First-degree manslaughter/extreme emotional disturbance.*

■■■ Springer asserts that she was entitled to instructions on first-degree manslaughter as a lesser included offense of murder and a concomitant instruction on extreme emotional disturbance. KRS 507.020(1)(a); KRS 507.030(1)(b); *Holbrook v. Commonwealth*, Ky., 813 S.W.2d 811, 815 (1991), *overruled on other*

grounds, *Elliott v. Commonwealth*, Ky., 976 S.W.2d 416 (1998). She identifies the victim's threat to sexually abuse her daughter as the "triggering event" required by our case law. *Whitaker v. Commonwealth*, Ky., 895 S.W.2d 953 (1995); *Cecil v. Commonwealth*, Ky., 888 S.W.2d 669 (1994); *Foster v. Commonwealth*, Ky., 827 S.W.2d 670, 678 (1991), *cert. denied*, 506 U.S. 921, 113 S.Ct. 337, 121 L.Ed.2d 254 (1992). Specifically, she testified that after the threat, "all she could think about" was what her husband had threatened to do to her daughter. The Commonwealth asserts that an instruction on the defense of extreme emotional disturbance is warranted only when the killing occurs concurrently with the triggering event or shortly thereafter. However, our precedents only require that the triggering event be "sudden and uninterrupted." *Foster, supra*, at 678. There is no definite time frame involved, so long as the triggering event remains uninterrupted. We recognized in *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464 (1986) that the onset of extreme emotional disturbance "may be more gradual than the 'flash point' normally associated with sudden heat of passion," so long as the condition is "a temporary disturbance of the emotions as opposed to mental derangement per se." *Id.* at 468. The fact that the triggering event may have festered for a time in Springer's mind before the explosive event occurred does not preclude a finding that she killed her husband while under the influence of extreme emotional disturbance.

■■■ A defendant is entitled to an instruction on any lawful defense which she has. *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 550 (1988), *cert. denied*, 516 U.S. 854, 116 S.Ct. 154, 133 L.Ed.2d 98 (1995). Although a lesser included offense is not a defense within the technical meaning of those terms as used in the penal code, it is in fact and principle, a defense against the higher charge. *Gall v. Commonwealth*, Ky., 607 S.W.2d 97, 108 (1980), *cert. denied*, 450 U.S. 989, 101 S.Ct. 1529,

67 L.Ed.2d 824 (1981), *overruled on other grounds, Payne v. Commonwealth,* Ky., 623 S.W.2d 867 (1981); *Brown v. Commonwealth,* Ky., 555 S.W.2d 252, 257 (1977); *cf. Coffey v. Messer,* Ky., 945 S.W.2d 944, 946 (1997). If the defendant introduces testimony, which, if believed, would support an inference that she is guilty of a lesser offense than the crime charged, she is entitled to an instruction on that offense. If, upon retrial, the evidence is the same, Springer will be entitled to instructions on first-degree manslaughter and extreme emotional disturbance.

### C. Self-protection.

■ Springer's primary defense was that she acted under a belief in the need for self-protection, which belief was induced by her affliction with the "battered woman syndrome." She presented substantial evidence of physical and sexual abuse inflicted upon her by her husband, as well as expert testimony from which the jury could conclude that she was suffering from the syndrome at the time she participated in the killing of her husband. The trial judge instructed the jury on self-protection as a defense to the charge that Springer was the principal to the homicide, but not as a defense to the charge that she was an accomplice. In fact, Springer conceded at trial that self-protection was unavailable as a defense to a charge of complicity. On appeal, she withdraws this concession and, presumably, will claim entitlement to a self-protection instruction as a defense to both theories on retrial. Thus, though unpreserved for the purpose of determining whether Springer's conviction should be reversed, RCr 9.54(2), the issue is ripe for determination as to whether the instruction should be given upon retrial.

The Commonwealth asserts that self-defense is available only to a principal, and is unavailable to one who whose liability is predicated upon complicity; and that Springer could not have been acting in self-protection under either theory, because the victim was asleep, thus could not

have been threatening her with the "imminent use of unlawful physical force." KRS 503.050(1).

Prior to the adoption of the penal code, it was generally held that an aider and abettor could not be convicted if the principal was acquitted. *E.g., Rutland v. Commonwealth,* Ky., 590 S.W.2d 682 (1979). That proposition is specifically rejected in KRS 502.030(1). However, even in the pre-penal code era, it was accepted that the liability of an accomplice is determined by his or her own *mens rea* and not that of the principal.

> If one commits a crime and another is actually present aiding, abetting, assisting, or encouraging its commission, the latter thereby becomes a participant, a principal in the second degree, and his culpability is determined by his motives . . . .

*Fuson v. Commonwealth,* 199 Ky. 804, 251 S.W. 995, 997 (1923). Although the homicidal act may be attributed to both participants, the liability of each is measured by his or her own degree of culpability. R. Lawson and W. Fortune, *Kentucky Criminal Law* § 3–3(c)(2), p. 114 (LEXIS 1998), quoting *Model Penal Code and Commentaries,* Pt. I, § 2.06, p. 321 (1985). Springer's claim of self-defense was premised upon her "battered woman syndrome" evidence. Logically, if such evidence would support an instruction on self-protection, it is immaterial whether Springer, herself, pulled the trigger or whether she aided, solicited, commanded or conspired with another to do so.

In *Commonwealth v. Rose,* Ky., 725 S.W.2d 588 (1987), *cert. denied,* 484 U.S. 838, 108 S.Ct. 122, 98 L.Ed.2d 80 (1987), we described the "battered woman syndrome" as a mental condition which "tends to explain why a person suffering from the syndrome would not leave her mate and would be driven by fear of continuing episodes of increased aggression against herself to perceive certain conduct was necessary in her self-defense, even

though another person not suffering from such a condition might believe or behave differently." *Id.* at 590–91; *see also Dyer v. Commonwealth,* Ky., 816 S.W.2d 647, 654 (1991) *overruling Commonwealth v. Craig,* Ky., 783 S.W.2d 387 (1990), which had temporarily overruled *Rose.* In 1992, our legislature added two new provisions to KRS Chapter 503. KRS 503.010(3) defined "imminent," a key word in the justification statutes, as follows:

> "Imminent" means impending danger, and, in the context of domestic violence and abuse as defined by KRS 403.720, belief that danger is imminent can be inferred from a past pattern of repeated serious abuse.

KRS 503.050, the statute authorizing the use of physical force in self-protection, was amended to add a new subsection (3):

> Any evidence presented by the defendant to establish the existence of a prior act or acts of domestic violence and abuse as defined in KRS 403.720 by the person against whom the defendant is charged with employing physical force shall be admissible under this section.

KRS 403.720(1) defines "domestic violence and abuse" as follows:

> "Domestic violence and abuse" means physical injury, serious physical injury, sexual abuse, assault or the *infliction of fear of imminent* physical injury, serious physical injury, sexual abuse, or assault between family members or members of an unmarried couple. (Emphasis added.)

■ The enactment of KRS 503.010(1) and KRS 503.050(3) shortly after the emergence of the "battered woman syndrome" as a phenomenon scientifically accepted in the medical community reflects a legislative intent to allow the defense of self-protection to be premised upon "battered woman syndrome" evidence. If sufficient competent evidence is introduced to create a jury issue that a defendant was a victim of domestic violence and abuse and killed or assaulted his or her abuser under

a belief that there was an "impending danger" of being subjected to unlawful physical force at the hands of the abuser, that defendant is entitled to an instruction on self-protection. Because of the nature of this claim, the instruction normally will be accompanied, as here, by the wanton or reckless belief qualification set forth in KRS 503.120(1). *Shannon v. Commonwealth,* Ky., 767 S.W.2d 548, 548–51 (1988), *overruled on other grounds, Elliott v. Commonwealth,* Ky., 976 S.W.2d 416 (1998).

If the evidence is the same upon retrial, Springer will be entitled to instructions on self-protection as a defense to both the principal and accomplice theories of liability.

## V. JURY INSTRUCTIONS/EADES.

### A. Second-degree manslaughter.

■ The trial judge determined that there was sufficient evidence to warrant an instruction on the defense of voluntary intoxication with respect to the culpability of Eades. However, Eades's request for an instruction on second-degree manslaughter as a lesser included offense was denied. As we held in *Slaven v. Commonwealth,* Ky., 962 S.W.2d 845 (1997):

> [W]hile voluntary intoxication is a defense to intentional murder, it is not a defense to second-degree manslaughter. *McGuire v. Commonwealth,* Ky., 885 S.W.2d 931, 934–35 (1994). A jury's belief that a defendant was so voluntarily intoxicated that he did not form the requisite intent to commit murder does not require an acquittal, but could reduce the offense from intentional homicide to wanton homicide, *i.e.,* second-degree manslaughter. KRS 501.080 (1974 Commentary); *Meadows v. Commonwealth,* Ky., 550 S.W.2d 511, 513 (1977). The failure to instruct on second-degree manslaughter as a lesser include offense of murder was prejudicial error. *Cannon v. Commonwealth,* Ky., 777 S.W.2d 591, 596 (1989).

*Slaven, supra*, at 857. If the evidence is the same on retrial, Eades will be entitled to an instruction on second-degree manslaughter as a lesser included offense of murder.

### B. Protection of another.

■ Eades asserts that if Springer is entitled to an instruction on the defense of self-protection, then she is entitled to an instruction on the defense of protection of another. KRS 503.070. There are prepenal code cases which support the proposition that "[w]hatever one may lawfully do in his own defense, another may do for him." *Biggs v. Commonwealth*, 164 Ky. 223, 175 S.W. 379 (1915); *Stanley v. Commonwealth*, 86 Ky. 440, 6 S.W. 155 (1887). *See also Utterback v. Commonwealth*, 105 Ky. 723, 49 S.W. 479, 483 (1899): "[I]f he so fired the fatal shot in defense of his son, he is excusable or not according as the son would be guilty had he then fired the shot himself in his own defense." However, it was also held that an intentional killing in defense of another was justified only if the defendant believed that the victim was about to kill or do great bodily harm to such other person. *White v. Commonwealth*, Ky., 333 S.W.2d 521, 524 (1960). Finally, there was no requirement to instruct on the defense of protection of another if the defendant made no claim to having so acted and no inference could be drawn from the evidence that it was reasonably necessary to do so. *Adams v. Commonwealth*, 292 Ky. 786, 168 S.W.2d 40 (1943); *Farley v. Commonwealth*, 268 Ky. 277, 104 S.W.2d 972 (1937).

If the defender uses non-deadly physical force in protection of another, he is judged by his own subjective belief as to whether the person being protected would have been privileged to act in self-protection. KRS 503.070(1). However, if, as here, deadly force is used, the defender is judged in accordance with the circumstances as they actually existed with respect to whether the person being protected would have been privileged to use deadly physical force in self-protection.

KRS 503.070(2)(b). This latter provision is contrary to the law of most other jurisdictions, R. Lawson and W. Fortune, *supra*, § 4–3(b)(3), *Perkins on Criminal Law* 1021 (2d ed. Foundation Press 1969), but represents a codification of the holding in *Stanley v. Commonwealth*, *supra*, that a defender intervenes at his peril if the person he killed was not at fault. *Id.*, 6 S.W. at 156.

Bearing these principles in mind, there are several reasons why Eades was not entitled to an instruction on protection of another. At trial, she claimed no involvement in the crime. In her confession, she did not claim to have killed Ernest Springer in defense of her sister. Kimberly Springer's entitlement to a self-protection instruction was premised not on the facts as they actually existed, but upon her theory that her affliction with the "battered woman syndrome" caused her to believe it was necessary to kill her sleeping husband. Eades was not suffering from "battered woman syndrome;" thus, her culpability is not dependent upon a syndrome-induced belief in the need to use deadly physical force in defense of Kimberly Springer, but upon the facts as they actually existed. Ernest Springer was killed while asleep in his bed. Under the actually existing facts, there was no need to kill Ernest Springer in order to protect Kimberly from "imminent death, serious physical injury . . . or [forcible] sexual intercourse" at his hands. KRS 503.070(2)(a). "The fear of future danger will not justify a homicide." *Grubbs v. Commonwealth*, 240 Ky. 473, 42 S.W.2d 702, 703 (1931). Although *Grubbs* pre-dates the penal code, that principle was codified by use of the word "imminent" in the justification statutes. R. Lawson and W. Fortune, *supra*, § 4–2(b)(3), p. 139. While evidence of domestic violence and abuse and affliction with "battered woman syndrome" may create an exception to that principle, that exception is unavailable to Eades.

## VI. SUFFICIENCY OF THE EVIDENCE/EADES.

 Eades asserts that absent her confession, there was insufficient evidence to support her conviction. She mistakenly believes that the corroboration requirement of RCr 9.60 relates to corroborative evidence of her guilt. In fact, the corroboration requirement addresses itself to whether a crime was committed, not to whether the defendant committed it. *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 410 (1987), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989). Once the corpus delicti has been established, the defendant's guilt may be established entirely by confession. *Dolan v. Commonwealth*, Ky., 468 S.W.2d 277, 282 (1971). Ernest Springer was killed by a single gunshot wound to the left temple while apparently asleep in his bed. The weapon that fired the shot was never found, a fact strongly militating against a claim of suicide. Even without Eades's confession, there was sufficient evidence to establish the corpus delicti.

## VII. VOIR DIRE.

 During voir dire, Springer's counsel was prevented from inquiring as to whether the jurors could consider the full range of penalties which might be authorized upon conviction, including the minimum penalty for conviction of an authorized lesser included offense, *i.e.*, one year (for reckless homicide) to life (for murder). Instead, she was permitted to inquire only as to whether the jury could consider the minimum penalty authorized for the most serious offense of which she could be convicted, *i.e.*, twenty years (for murder). In *Shields v. Commonwealth*, Ky., 812 S.W.2d 152 (1991), *cert. denied*, 502 U.S. 1065, 112 S.Ct. 953, 117 L.Ed.2d 121 (1992), we held:

> In order to be qualified to sit as a juror in a criminal case, a member of the venire must be able to consider any permissible punishment. If he cannot, then he properly may be challenged for cause.

*Id.* at 153. In *Anderson v. Commonwealth*, Ky., 864 S.W.2d 909 (1993), we held that defense counsel should have been able to question the venire as to whether the jurors "could consider the entire range of penalties in the event a guilty verdict was returned ." *Id.* at 911. In our most recent pronouncement on this issue, we held that the prosecutor was properly permitted to inform the jury that the range of permissible penalties, including those for lesser included offenses, was from one day to life in prison. *Samples v. Commonwealth*, Ky., 983 S.W.2d 151, 153–54 (1998).

In the case at bar, the jurors received instructions authorizing them to find Springer guilty of murder or of one of several lesser offenses, including reckless homicide. It was error to limit her counsel's inquiry only to whether the jurors could consider the full range of penalties available for the most serious offense of which they could return a conviction. Upon retrial, counsel will be permitted to inquire whether potential jurors can consider the full range of penalties for all offenses of which Springer might be convicted, i.e., one year to life in prison.

## VIII. ABSENCE OF COUNSEL.

 Springer asserts she was denied her right to counsel, because her attorney was absent at critical stages of the proceedings, *viz:* during the avowal testimony of a witness at a pre-trial suppression hearing, during a hearing on a pre-trial motion to suppress evidence of her prior sexual acts, and during an instruction conference. This argument is totally devoid of merit.

The avowal testimony was that of Dr. Paul Deardorff, an expert retained by Eades to offer evidence concerning her intellectual limitations for the purpose of undermining the credibility of her confession. His report was in the record; he purported to offer no evidence relevant to the guilt or innocence of Springer; and neither Eades nor Springer asserts that

any of his avowal evidence was erroneously excluded at trial.

As for the other two "absences," Springer was represented by two attorneys. One co-counsel was present at both the pre-trial suppression hearing and the instruction conference. In fact, there were two instruction conferences, one off the record and another on the record. So-called "lead counsel" was present at the off-the-record instruction conference and so-called "second chair counsel" was present at the on-the-record conference. Ironically, it was Springer's lead counsel who conceded at the off-the-record conference that Springer was not entitled to a self-protection defense to the charge of complicity. At the on-the-record conference, second chair counsel advised the judge that he disagreed with lead counsel on that point.

### IX. SENTENCING.

■ KRS 533.060(1) provides that a person convicted of a Class A, B or C felony which involved "the use of a weapon from which a shot or projectile may be discharged that is readily ·capable of producing death or other physical injury" is not eligible for probation, shock probation, or conditional discharge. A 1992 amendment of this statute created an exception:

> ... when the person establishes that the person against whom the weapon was used had previously or was then engaged in an act or acts of domestic violence and abuse as defined in KRS 403.720 against either the person convicted or a family member as defined in KRS 403.720 of the person convicted. If the person convicted claims to be exempt from this statute because that person was the victim of domestic violence and abuse as defined in KRS 403.720, the trial judge shall conduct a hearing and make findings to determine the validity of the claim and applicability of this exemption. The findings of the

court shall be noted in the final judgment.

1992 Ky. Acts ch. 173 § 3.

KRS 439.3401 provides minimum parole eligibility guidelines for prisoners classified as "violent offenders." The 1992 legislature also amended this statute to add a new subsection (4):

> This section shall not apply to a person who has been determined by a court to have been a victim of domestic violence or abuse pursuant to KRS 533.060 with regard to the offenses involving the death of the victim or serious physical injury to the victim.

1992 Ky. Acts ch. 173 § 4.

Thus, the legislature determined, for whatever reason, that the exemption from the probation or conditional discharge restrictions in KRS 533.060(1) applies whether the domestic violence and abuse occurred previous to the offense or at the time the offense was committed; but the exemption from the parole restrictions in KRS 439 .3401 applies only if the domestic violence and abuse was "involved" in the offense. The trial judge interpreted both of these provisions to mean that the exemptions applied only if the domestic violence and abuse was involved in the offense, and found that such was not the situation in this case. The trial judge is not required to accept the defendant's version of the events surrounding the offense; thus, the trial judge's finding on this issue was not clearly erroneous and would have precluded Springer from benefitting from the exemption in KRS 439.3401(4). However, the trial judge should have made an additional finding whether Springer had been previously subjected to domestic violence and abuse so as to fall within the exemption in KRS 503.060(1). Nevertheless, the failure to make that additional finding did not prejudice Springer, because the trial judge treated her as if she were eligible for probation or conditional discharge, but found that such a disposition was inappropriate because it would unduly depreciate the seriousness of the crime.

KRS 533.010(2)(c); *cf. Hughes v. Commonwealth*, Ky., 875 S.W.2d 99 (1994).

For the reasons stated herein, the convictions and sentences imposed on both Springer and Eades are reversed and this case is remanded to the Kenton Circuit Court for a new trial in accordance with the contents of this opinion.

COOPER and JOHNSTONE, JJ., concur.

LAMBERT, C.J., concurs as to Parts II, IV, V, VI, VII, VIII and IX, and dissents as to Parts I and III.

GRAVES, J., concurs as to Parts II, III, IV, V, VI, VII, VIII and IX, and dissents as to Part I by separate opinion, in which he is joined by LAMBERT, C.J., and WINTERSHEIMER, J.

STEPHENS and STUMBO, JJ., concur as to Parts I, II, IV, V, VI, VII, VIII and IX.

STUMBO, J., dissents as to Part III by separate opinion, in which she is joined by LAMBERT, C.J., and STEPHENS, J.

WINTERSHEIMER, J., concurs as to Parts II, III, IV–A, V–B, VI, VIII and IX, and dissents by separate opinion as to Parts I, IV–B and C, V–A and VII, in which he is joined by LAMBERT, C.J., and GRAVES, J., as to Part I.

GRAVES, Justice, dissenting.

Respectfully, I must dissent from so much of the opinion that finds reversible error in the allocation of peremptory challenges. The majority opinion holds that the appellants were jointly entitled to 13 peremptory challenges. The trial court's interpretation of the rules so as to allow 11 peremptory challenges is reasonable. Under the facts of this case, I would apply a harmless error analysis and affirm the judgment of the trial court. Therefore, I would modify the inflexible holding in *Kentucky Farm Bureau Mut. Ins. Co. v. Cook*, Ky., 590 S.W.2d 875 (1979).

LAMBERT, C.J., and WINTERSHEIMER, J., join in this dissent.

STUMBO, Justice, dissenting.

Respectfully, I must dissent from that part of the majority opinion (part III) which concludes evidence of Springer's prior sexual activity was properly admitted at trial. I believe the probative value of all of this evidence was substantially outweighed by its potential to unduly prejudice the jury against Springer. KRE 403.

The probative value of Kenneth Clark's testimony that he and Springer had kissed, fondled, and flirted on a few occasions was minimal. This evidence, which was presented to support the theory that Springer killed her husband in an effort to free herself to be with her "lover" (the two never even had sexual intercourse), really fell considerably short of proving this motive, but went far towards painting Springer as an irreverent, immoral woman deserving of some sort of castigation. Given the tenuous probative value of this evidence when compared to the extreme prejudice it was likely to generate, I would have held the evidence inadmissible under KRE 403.

Similarly, I disagree with the majority's approval of the admission of testimony regarding Springer's apparent willingness to participate in three-person sexual intercourse, and the admission of Sgt. Johnson's description of the contents of the brown briefcase. Although the Commonwealth argues this evidence was crucial to rebut Springer's claims of abuse, in reality, the Commonwealth introduced no evidence to rebut the overwhelming evidence Springer introduced to show she was repeatedly battered by her husband. Contrary to the Commonwealth's purported reason for introducing the evidence of Springer's past sexual conduct, this evidence did little to dispel the notion that Springer was physically abused by her husband, but nonetheless had the desired effect of portraying her as far outside the

sexual mainstream so as to incur the wrath of the jurors and invite them to convict Springer for her sexual predilections rather than for any crime she may have committed. This evidence was far more prejudicial than probative, and should have been excluded at trial.

Lastly I would note that, although the trial judge did conclude that displaying the contents of the briefcase might unduly prejudice Springer in violation of KRE 403, she nevertheless permitted Sgt. Johnson to describe the contents and to opine that the photographs and videotape depicted "two consenting adults having fun." This ruling fell far short of protecting Springer from the extreme prejudice that inevitably would result from such a biased description of evidence. Upon retrial, should the Commonwealth seek to introduce this evidence again, I would respectfully suggest that Sgt. Johnson be made to limit his description to clinical terms, i.e ., "two adults engaging in intercourse, apparently consensual."

LAMBERT, C.J., and STEPHENS, J., join.

WINTERSHEIMER, Justice, dissenting.

I join the dissenting opinion authored by Justice Graves in regard to the interpretation of the law concerning peremptory strikes. In addition, I would respectfully dissent from the majority opinion in regard to three other issues discussed in it.

The circuit judge properly determined that no jury instruction on the lesser-included offense of second-degree manslaughter was warranted by the evidence in the Eades case. Initially, I do not believe that the question was properly preserved for appellate review pursuant to RCr 9.54(2). Evidence was presented that Eades did the shooting and that it was a premeditated and deliberate act. There were conflicting statements regarding the facts, but unless the jury believed that Eades was not guilty at all, they must have believed that she intentionally killed the victim. The trial court is required to instruct only on those lesser-included offenses which are supported by the evidence.

The majority opinion concedes the fact that the claim of self-defense was not preserved for appellate review.

My review of the record indicates that defense counsel agreed with the decision of the trial court on the issue of the voir dire of the jury as to penalty ranges for the possible lesser-included offenses. This issue was not properly preserved for appellate review.

Under all the circumstances, it would appear that there is no substantial possibility that the result in these cases would have been any different in the absence of the alleged irregularity. Thus any errors are nonprejudicial. RCr 9.24. Any defendant is guaranteed a fair trial, but that does not mean a perfect trial free from any and all possible error. *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). "What it does mean is that a litigant is entitled to at least one tolerably fair trial of his action." *McDonald v. Commonwealth*, Ky., 554 S.W.2d 84 (1977). A review of the entire proceedings indicates that the defendants received a fundamentally fair trial.

I would affirm the convictions in all respects.

LAMBERT, C.J., and GRAVES, J., join this dissent as to part I.