Sam **PENNINGTON** and **Juanita Pennington,**
**Appellants,**

**v.**

**COMMONWEALTH** of Kentucky, Appellee.

Court of Appeals of Kentucky.

June 26, 1970.

Henry E. Hughes, Keller & Hughes, Lexington, for appellants.

John B. Breckinridge, Atty. Gen., Laura Murrell, Asst. Atty. Gen., for appellee.

PALMORE, Judge.

Sam Pennington and wife, Juanita, appeal from a judgment entered pursuant to a jury verdict finding them guilty of the murder of Oscar Burkhart, a deputy sheriff of Harlan County, and fixing their punishment at life imprisonment. KRS 435.010.

Despite various inconsistencies the evidence pointing to the guilt of both appellants was overwhelming. Nevertheless, it is contended that Sam Pennington was entitled to a directed verdict, so it is necessary to summarize the salient details.

The Penningtons resided on the outskirts of the City of Harlan. At about dusk on November 12, 1968, Juanita received word by telephone to the effect that Burkhart had just arrested their son, Frank (a grown man), and had beaten him up in the process. She and Sam immediately got in their automobile and proceeded into town where, as fate would have it, they came up behind the very car in which Burkhart was taking Frank to jail. Unfortunately for all concerned, Burkhart had to stop at a red light, and the Penningtons stopped immediately behind. Juanita, who was driving, got out of the Pennington car at once and went to the door on the driver's side of Burkhart's automobile, where she fired several shots at Burkhart with a pistol. Meanwhile, Sam approached the Burkhart car on the other side, and there is an abundance of evidence that he too fired one or more shots at Burkhart with a pistol. Not surprisingly, Burkhart was killed. There were at least seven bullet holes in his body, though only one bullet was found still lodged in the body. This was a .45 calibre missile which, according to the examining physician, apparently had entered from the right side, passed through the upper part of Burkhart's chest, and came to rest pointing from his right to left in the large muscle under the left shoulder blade. The wounds on Burkhart's left side appeared to have been made by bullets of a smaller calibre. Witnesses say that the shots fired on the right side of the car sounded louder than those on the left side.

We are scarcely able to comprehend how it can be seriously argued that there was not enough evidence to submit the case against Sam to the jury. Though Sam testified that Burkhart's right-hand door was locked and the window-glass rolled up, and there was no evidence of damage to the glass on that side, other witnesses said they saw him open the door. Certainly we cannot accede to counsel's assertion that the "testimony that this door was locked and did not open is completely uncontradicted by any evidence offered by the Commonwealth." As a matter of fact, since some of the witnesses testified that Sam fired through the window on the right side, it was by no means a foregone conclusion that the glass was up.

After 12 prospective jurors had been accepted by both sides but had not been sworn it was discovered that there were two misdemeanor indictments pending against one of them, a Mrs. Melton, who in conformity with RCr 9.66 had been sequestered overnight with the other female jurors. This being a disqualification under KRS 29.025, the trial court, over objection by counsel for the defense, excused Mrs. Melton and proceeded to empanel and qualify another juror. It is the contention of appellants that this was a prejudicial error, but if not, then it was error not to discharge the remaining jurors for the reason that they had been sequestered with a "stranger" in their midst, contrary to the mandate of RCr 9.66 that the jurors be kept together.

The pertinent language of KRS 29.025(1) reads as follows: "No person shall be qualified as a juror * * * unless he or she is * * * not under indictment, and, if convicted of a felony, has been pardoned." It is first argued that the words "under indictment" as thus used mean indictment for a felony. We find the phraseology and punctuation of the statute too plain to accept that construc-

tion. It is next contended that since the two indictments against Mrs. Melton had been "continued generally" and placed on the "standby docket" they had been effectually dismissed. We cannot acquiesce in that viewpoint either. It may be that a defendant who insists on a final disposition of his case could successfully attack an indefinite continuance granted over his objection, but there is no doubt that he can consent to it or that there are other circumstances under which such a continuance may be reasonable and valid. There is nothing in this case to show that these two indictments were no longer valid.

■ RCr 9.36(3) provides, "Challenges for peremptory or for cause must be made before the juror is accepted except that the court for good cause may permit such challenges until the jury is sworn." Appellants maintain that under the facts in this instance the late challenge was not "for good cause." For one thing, they say, the Commonwealth's Attorney should have been aware of the disqualification, since the indictments in question were pending in the Harlan Circuit Court. That may or may not be. We are inclined to the view that the trial judge not only should and does have a broad discretion as to the conditions that add up to "good cause," but may very well be under a positive duty to remove a prospective juror if before the jury is sworn he learns that there is a statutory disqualification. We find no error in this respect.

■ RCr 9.66 is not as explicit as its precursor, Section 244 of the old Criminal Code. Nonetheless, as the explanatory comment indicates, the intended effect is the same. After jurors or prospective jurors in a capital case have been accepted and until the trial is over they are to be kept together and separate from outside influence, except as otherwise provided. This does not mean, however, that if one of them is for some reason eliminated after being sequestered with the others he must be regarded as having been an outsider. Until Mrs. Melton was released by the trial court she was just as much a juror or prospective juror as were the others. She had been accepted by both sides. The situation that developed thereafter was the same as if she had become ill, or had died, or had been excused for some other good cause. She did not become, retroactively, a "stranger." The purpose of the law is to prevent tampering with jurors. Tampering among themselves is prevented by admonition. While she was with the other prospective jurors Mrs. Melton was under that admonition, and it is not to be presumed, any more than it is presumed with respect to the other jurors, that it was disobeyed.

Objection was made to the two portions of the Commonwealth's Attorney's closing summation to the jury, which were as follows:

(1) "You don't have to worry which one's bullet did it. If one of them did it and the other standing there wishing him well, taking part or helping to any degree, the one that helped is just as guilty as the other one, even though he may have died from the other one's bullet."

(2) "When you go back home, if you don't find a verdict of murder in this case, I wonder how you are going to feel when you look in the mirror to shave, and you, women, when you start combing your hair; I wonder what you are going to think about when you look at your neighbors and the people in this courtroom and other people that heard this evidence and these witnesses testify. I wonder what you are going to think about the well-being in Harlan County and the United States, when you look in the faces of your own children and your own relatives. This case is now submitted to you, your respect for law and order, your respect for your home, this country * * *."

■ The first of these remarks, it is said, misstated the law. We think not. It seems to us that the evidence was enough to convict Sam as an aider and abettor even if he had not fired a shot. Cf. Lee v. Commonwealth, 262 Ky. 15, 89 S.W.2d 316, 317 (1936). However, there was no instruction on aiding and abetting, and we must look to the instructions actually given to determine the law of the case. Instruction No. 1 authorized the jury to find the Penningtons guilty of murder if they "or either of them" shot Burkhart. Literally, this instruction permitted conviction of either defendant entirely on the basis of what was done by the other, regardless of his own presence or participation. In this respect it was improperly drawn, but there was no objection to it. The argument made by the Commonwealth's Attorney certainly was consistent with the instructions that were given, and it was consistent also with a correct aiding and abetting instruction if it had been given. Cf. § 869, Stanley's Instructions to Juries.

■ The last comments called into question, relating to the feelings the jurors must anticipate when meeting face to face with their friends and neighbors, etc., were borderline remarks in view of the principle that counsel may not suggest to jurors that they will be the objects of scorn and contempt if they do not bring in a certain verdict. We acknowledge the authorities cited by appellants to this effect. On the other hand, surely lawyers may appeal to the conscience of the jury, and it is our reaction that this particular argument was directed more to the subjective feelings of the jurors than to the reproach they might expect to experience from others. It is close, but we are not disposed to believe or to hold it was wrong. Nor, for that matter, could we find it prejudicial, because this simply was one of those cases in which the evidence itself had such destructive force that there was hardly any way for anything else to add to it. The appellants are fortunate indeed to live in a country in which they were entitled to a full-dress trial.

The judgment is affirmed.

All concur.