William ANDERSON, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Wilma Hans ANDERSON, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Nos. 92–SC–194–MR, 92–SC–207–MR.

Supreme Court of Kentucky.

Oct. 28, 1993.

**910**

Mark J. Stanziano, Somerset, for appellants.

Chris Gorman, Atty. Gen., Gregory C. Fuchs, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

LEIBSON, Justice.

This is a matter-of-right appeal of the joint trial of William and Wilma Anderson in McCreary Circuit Court. William was convicted of two counts of first-degree rape, for which he was sentenced to two 20–year terms of imprisonment, to run consecutively. Wilma was convicted of two counts of first-degree criminal abuse, for which she received two 10–year sentences, to run consecutively. The appeals were consolidated.

William was convicted of raping D.H. on two separate dates in April, 1991. D.H. was then fourteen years of age and living with her mother, Wilma, and her mother's boyfriend, William. William and Wilma were married after April 1991 and before the trial. At trial the same attorney represented both defendants.

Essentially, the case turned on the testimony of D.H., now William's step-daughter, with no physical examination or supporting medical evidence, or other eyewitness testimony. The only other Commonwealth witnesses were those with secondhand information from the step-daughter, i.e., Detective McKinney of the Kentucky State Police, a school counselor, and a social worker who investigated for the Kentucky Cabinet for Human Resources.

D.H., the complaining witness, testified William molested and raped her on a number of occasions, including the dates specified, and that he told her "if [she] told anybody he wouldn't get me anything and he said he would kill me." D.H. also testified her mother had knowledge of the rape but did nothing to help her:

"He would come in drunk and have my mom make me sleep on the couch. And he would come in on the couch and drag me into my room. Make me put on one of his shirts. And then that's when he raped me."

The defense consisted of the testimony of neighbors that the step-daughter was angry because her parents prevented D.H. from

seeing a boyfriend, Willie James Watson, who was age 29, with whom she had a relationship. Further, one of these witnesses testified D.H. was baby-sitting on the dates and at the time D.H. testified that the offenses charged took place.

The appellants allege seven errors occurring during the trial of this case require reversal, and we agree as to four of them. These we will discuss in this Opinion.

We find no merit in the remaining claims. One relates to evidence of sexually explicit letters and notes written by the complaining witness about her school friends, which were properly suppressed under the so-called "Rape Shield" law, now codified in KRE 412. Another relates to evidence admitted against William regarding prior sexual and physical misconduct against the complaining witness, conduct which was sufficiently relevant to the offenses charged that it does not classify as collateral criminal activity. And a third relates to whether Lithium affected the testimony of the complaining witness at the time she was testifying, which is irrelevant to a retrial.

Turning to the four errors upon which we reverse, they are as follows:

## I. VOIR DIRE ON THE ISSUE OF PUNISHMENT

■ The appellants claim it was reversible error to deny their counsel the opportunity to question the venire about whether the jurors could consider the entire range of penalties in the event a guilty verdict was returned. During voir dire the trial court sustained objection to defense counsel's mention of the penalties possible in this case. In *Shields v. Commonwealth*, Ky., 812 S.W.2d 152, 153 (1991), we held:

"In order to be qualified to sit as a juror in a criminal case, a member of the venire must be able to consider any possible punishment. If he cannot, then he properly may be challenged for cause."

■ Here the appellants were denied the right to meaningful voir dire on the issue of punishment. Since both received the maximum sentence on all charges, we can hardly say that it was harmless error to deny meaningful inquiry into whether the jurors were open to consideration of a lesser sentence within the range of possible penalties, should circumstances warrant it. This *Shields* error requires reversing the judgment as to penalty. It would not, per se, require setting aside the findings of guilt, were it not for further errors discussed below.

## II. JUROR BIAS

■ On motion for a new trial the appellants complained of undisclosed juror bias involving two jurors: Betty Crabtree, the foreman, who was related by marriage to the appellant, William Anderson, and Timothy Clark. Since Betty Crabtree's counter-affidavit raises a question as to whether she knew of the unrevealed relationship, we will confine our consideration to Timothy Clark.

After trial, the appellants learned that Timothy Clark was related to and lived in the same rural area of the County with the complaining witness's boyfriend, Willie Watson. Juror Clark was married to Watson's cousin, Janet Watson Clark. On voir dire appellants' counsel asked:

"Is there anybody on the jury that knows a person by the name of Willie Watson—James Watson—Willie Watson from Marshes Siding?"

None of the jurors responded. Much of this trial centered around whether D.H. fabricated her story in order to "punish" her parents for interfering with her relationship with Willie Watson.

Appellants filed affidavits in support of their motion for a new trial addressing this argument, including a statement from a defense witness:

"I know that Mr. Clark is actually related to Mr. Watson and lives in the same general area of McCreary County as Watson does. He has been known to spend time with Watson and Watson's relations in the Marshes Siding area of the County, near my home."

This is more than enough to compel the inference Juror Clark concealed vital information on voir dire, information which may have justified a challenge for cause in and of itself on grounds of implied bias, and which,

at the least, if truthfully given, would have enabled the appellants to exercise their peremptory challenges intelligently.

While the record before us does not reveal whether Juror Clark failed to respond intentionally or inadvertently, "the harm lies in the falsity of this information, regardless of the knowledge of its falsity on the part of the informant; while willful falsehood may intensify the wrong done, it is not essential to constitute the wrong[.]" *Sizemore v. Commonwealth*, Ky., 306 S.W.2d 832, 834 (1957), quoting from *Olympic Realty Co. v. Kamer*, 283 Ky. 432, 141 S.W.2d 293, 297 (1940).

> "The right of challenge includes the incidental right that the information elicited on the voir dire examination shall be true; the right to challenge implies its fair exercise, and, if a party is misled by erroneous information, the right of rejection is impaired; a verdict is illegal when a peremptory challenge is not exercised by reason of false information." *Id.*

See also, *Johnson v. Commonwealth*, 311 Ky. 182, 223 S.W.2d 741 (1949), reversed for similar reasons, and *Drury v. Franke*, 247 Ky. 758, 57 S.W.2d 969, 984 (1933), discussing "[t]he reasons why a litigant is entitled to a new trial because a juror gave a false answer, or no answer, to a pertinent question addressed to him on the voir dire examination."

### III. THE TAPED STATEMENT OF THE COMPLAINING WITNESS

After the complaining witness, D.H., completed her testimony on direct examination, appellants' counsel attempted to approach the bench to request that the Commonwealth produce any statement taken from the witness, before undertaking cross-examination. The trial court denied counsel the right to make the motion. At the first reasonable opportunity to preserve the record (as the Commonwealth has conceded), defense counsel advised the court that he had been seeking to "move to be provided with her ... prior statement." Although the Commonwealth Attorney then stated in chambers that he had no such statement "at the time," nor was "he aware of any statements at the time," Kentucky State Police

Detective McKinney, the investigating officer who both testified at trial and sat through the trial as the Commonwealth's representative, refutes this claim. Detective McKinney had testified under oath during his cross-examination that he had a taped statement from D.H., and he repeated this during the exchange that took place in chambers at the close of the Commonwealth's case.

Regardless of whether the Commonwealth's Attorney was personally aware of the statement, the Commonwealth was obliged to produce this statement under RCr 7.26(1). In *Ballard v. Commonwealth*, Ky., 743 S.W.2d 21 (1988), the record disclosed that evidence regarding a "medical report based on a physical examination of the complaining witness" was suppressed by the investigating officer for the Department of Human Resources. We reversed stating:

> "Apparently, the Commonwealth's Attorney was unaware of the withheld medical report, but an investigating officer who was a witness for the Commonwealth and who sat beside the Commonwealth's Attorney during the entire trial had been furnished a copy of the report before trial.
>
> . . . .
>
> The Department for Human Resources, an agency of the Commonwealth, and the Commonwealth's investigating officer suppressed evidence favorable to the accused. We shall not condone such reprehensible action. This conduct was in violation of an order of the court and denied appellant a fair trial. Reversal is required."

RCr 7.26(1) states unequivocally that "[s]uch statement shall be made available for examination and use by the defendant." Assuming it is true the Commonwealth Attorney was not personally aware of the statement, the error is no less palpable where the police detective who took the statement is sitting at his side. It is no answer to say the Commonwealth Attorney is "unaware" of a statement, if the statement was taken by the investigating officer in charge of the case. In such circumstances the knowledge of the detective is the knowledge of the Commonwealth. The Commonwealth's Attorney should advise the police that such evidence must be produced, and he bears the same

responsibility for producing the statement as would pertain if it were in his file.

Nor are we impressed by the Attorney General's suggestion that the record is confusing as to whether the statement in hand was actually one taken from Wilma rather than D.H. Detective McKinney's statements leave little room for doubt. The testimony of the detective on this subject, given from the stand and repeated in chambers, sufficiently establishes that RCr 7.26 was violated, and violated in circumstances where prejudice must be presumed. If what was stated was incorrect, the Commonwealth should have established the error. While we recognize there are circumstances under which failure to comply with RCr 7.26 has been viewed as harmless error, this is not one of them.

This case is similar to *Mounce v. Commonwealth*, Ky., 795 S.W.2d 375 (1990), wherein we concluded there was prejudicial error in failure to provide the defense counsel with an exculpatory report.

We cannot presume that there is nothing in this statement from D.H., which would have been useful on cross-examination. We agree with the appellants that it was too late for their counsel to demand that the statement be produced when they conferred in chambers after the Commonwealth had closed its case. We further agree that the trial court compounded the error by denying defense counsel an opportunity to approach the bench and request the statement before cross-examination.

## IV. WILMA ANDERSON'S INCRIMINATING ORAL STATEMENT

The most significant piece of evidence supporting the otherwise uncorroborated testimony of the complaining witness came in through the testimony of the social worker who investigated the case for the Cabinet for Human Resources. She testified that, having first interviewed the child, she then interviewed the appellant, Wilma:

"A: ... And one of the things she said—

Appellant's Counsel: I object to this.

A: —in response to the question, what did you do—

Appellant's Counsel: Object to this, Your Honor.

Court: Overruled.

A: —what did you do to try to protect your daughter? Your daughter says these things have happened, what did you do to try to protect her? She said something about, well, one time I stopped it. I dragged her out of his bed.

Q: And this—excuse me. And this was on the 18th.

A: Yes, it was.

Q: And she told you that at one time she had stopped it. She dragged her out of his bed?

A: Yes, she did."

This testimony, if believed, incriminates both appellants. It implies William was guilty of the charges being made against him, and Wilma knowingly permitted the child in her custody to be abused.

The social worker was then asked whether it was her practice "to take notes or someway memorialize the conversations that you have pursuant to these interviews," and the following took place:

"A. We do take notes, and we try to be as specific and as accurate, of course as possible.

Q: And did you, after your interview with Ms. Hans [now Anderson], make such notes?

A: Yes, I did.

Q: And have you had an opportunity to review your notes before you came to court today?

A: Yes.

Q: And do your notes reflect that you recorded that statement as made by Wilma Hans on that date?

A: My notes do reflect that is—

Appellant's Counsel: I am going to object to this.

Court: Overruled.

Appellant's Counsel: Your Honor, the notes weren't provided in discovery.

Witness: It's part of the case record, which I understand has been made available to both attorneys.

Appellant's Counsel: It has not been made available to the defense.

Court: Let's don't argue about it. She answered the question. Go ahead."

The appellant had sought discovery of this material as authorized by RCr 7.24. This rule requires "the commonwealth to disclose the substance of any oral incriminating statement known by the attorney for the commonwealth to have been made by a defendant to any witness, and to permit the defendant to inspect and copy or photocopy any relevant ... written or recorded statements or confessions made by the defendant."

To protect the confidentiality of the records of the Cabinet for Human Resources, in response to the appellants' discovery demand the trial court had entered an order requiring the records in question to be turned over to the court, and this order specified:

"Thereafter, the Court shall make an *in-camera* inspection of the records and shall allow the Defendants to have access to those portions of the records which are either discoverable or exculpatory."

■ Clearly this critical information used against both appellants was "discoverable." Nevertheless, the trial court notified counsel by letter that there were no items of this nature contained in the records. Whether the mistake that was made was inadvertent or intentional, and whether the mistake was made by the Commonwealth's Attorney or by the trial court, or both, is immaterial. In either case, the on-going discovery order and the mandates of RCr 7.24 required the exclusion of this evidence when it had not been provided on discovery.

Failure to provide discovery had a double-barreled prejudicial effect. First, it denied the defense the opportunity to prepare for and refute the incriminating evidence by cross-examination or other proof, if such was possible. Further, it denied these appellants the opportunity to seek separate trials on grounds that an incriminating statement which was admissible against the one making it was hearsay as to the other defendant, but was being used against both. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and *Cosby v. Commonwealth,* Ky., 776 S.W.2d 367 (1989). Indeed,

these two appellants, who shared the same attorney, suddenly had a conflict of interest problem thrust upon them in the middle of their trial.

The issue here is not when and whether CHR records are entitled to the cloak of confidentiality. When information disclosed in those records is discoverable in a criminal case, either because it is exculpatory or because the records reflect incriminating statements which may be used against the accused, those records must be provided.

## V. CONCLUSION

It has been difficult to review claims of error in this case because the trial court repeatedly cut off the defense counsel when seeking to make objections or provide explanation for objections. We discuss three instances where this practice was important in this case.

Counsel was cut short on voir dire when trying to explain what he wished to ask with reference to the penalty:

"Commonwealth: Object to any reference to the penalty, Your Honor.

Appellant's Counsel: I believe I have—

Court: Sustain.

Appellant's Counsel: Well, I would like to make a record then, at the finish.

Court: This is the record you make. You offered it, he objected, I sustained it. That's all the record you need."

Counsel was cut short when trying to obtain D.H.'s statement before starting to cross-examine the witness:

"Appellant's Counsel: May we approach the bench before I—

Court: I don't know why. Just go ahead and ask.

Appellant's Counsel: Well, I have a motion to make.

Court: Just go ahead and ask."

And, although the nature of the motion for a new trial suggested that an evidentiary hearing would have been helpful in considering whether jurors responded properly to questions asked on voir dire, the trial court held no such hearing. Instead, he simply ordered the Commonwealth to "obtain an affidavit from the two jurors in question to determine if there is any substance to the allegations," and thereafter ordered the mo-

tion overruled "after hearing arguments of counsel." This unsatisfactory procedure was used even though the Commonwealth furnished a counter-affidavit as to only one of the suspect jurors, Betty Crabtree, and furnishing nothing as to the second, Timothy Clark.

We cannot hold defense counsel strictly accountable to the rules regarding making contemporaneous objections when the record suggests counsel was repeatedly denied a reasonable opportunity to make a record.

For the reasons stated, we vacate the judgment, and reverse and remand to the trial court for further proceedings in conformity with this Opinion.

STEPHENS, C.J., and COMBS, LEIBSON, REYNOLDS and SPAIN, JJ., concur.

LAMBERT and WINTERSHEIMER, JJ., concur in results only.