Michael PENMAN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2004–SC–000726–MR.

Supreme Court of Kentucky.

May 18, 2006.

238

Shelly R. Fears, Emily Holt Rhorer, Department of Public Advocacy, Frankfort, for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, George G. Seelig, Assistant Attorney General, Office of Criminal Appeals, Frankfort, for Appellee.

Opinion of the court by Justice SCOTT.

The Appellant was charged and convicted in the Jessamine Circuit Court on four counts of trafficking in controlled substances, first-degree (second or subsequent offense) and one count of possession of controlled substances, first-degree (second or subsequent offense) and sentenced to a total of forty-five years.

He now appeals as a matter of right, Ky. Const. § 110(2)(b), alleging the trial court erred (1) when it refused to suppress the cocaine and resulting lab reports, (2) in admitting the drug analysis at trial, (3) in failing to grant a directed verdict of acquittal on all counts for reasons the Commonwealth failed to prove the chain of custody of the cocaine beyond a reasonable doubt, (4) in allowing introduction of documents not provided to the defense pursuant to RCr 7.24, (5) in denying Appellant's motion to suppress the cocaine seized from his vehicle, (6) in denying Appellant's challenge for cause to juror 448, forcing him to use a peremptory challenge and (7) by joining indictments 03–CR–00093, 03–CR–00135 and 04–CR–00155 for trial.

After reviewing the record, we affirm Appellant's convictions and sentence.

### FACTS

K.A. was caught by the Nicholasville Police Department (NPD) with a half ounce of cocaine and agreed to "work off" his charges by acting as a confidential informant—making buys from other dealers. As such, he made three "controlled buys" from the Appellant, one each on March 28, 2003, April 15, 2003, and May 7, 2003. Each buy was made under "controlled buy" protocols, supervised by the officers. Either audio, or video tapes, were made of the transactions.

After the last buy on May 7, 2003, the decision was made by NPD to arrest Appellant later that day. He was thereafter located and followed while driving the black Ford Expedition, which he had used in some of the other drug transactions, then stopped and ordered to get on the ground. As he exited the Expedition, however, he fled, but was caught and arrested almost immediately, approximately a block away. The Expedition was then searched, revealing approximately 200 grams of cocaine in the center console. A search of his wallet at the time uncovered currency, the serial numbers of which were identical to the serial numbers used in the earlier "controlled buy."

He was released later on bond, but rearrested on May 31, 2003, once the arrest warrant for his indictment was issued. During this attempted stop and arrest, he drove off until turning into a dead end street, whereupon he stopped. At the time he had a passenger in the front seat. After the stop, a packet of cocaine was found in the passenger area of the vehicle. However, Appellant, after having been "Mirandized," agreed the cocaine was his.

As indicated, he was indicted by the Jessamine Circuit Court on May 30, 2003, on four counts of trafficking in a controlled substances, first-degree (second or subsequent offense) for the March 28 and April 15 buys and the two instances on May 7, 2003, pursuant to indictment number 03–CR–00093.[1] On August 1, 2003, the Appellant was indicted for trafficking in a controlled substance first-degree (second or subsequent offense) for the May 31, 2003, traffic stop.[2] One week before trial, the

Appellant was indicted on another count of first-degree trafficking in a controlled substance, cocaine, pursuant to indictment number 04–CR–155. This count was based on an alleged exchange of a handgun for cocaine between the Appellant and an unknown white male, which occurred (and had been audio taped) during K.A.'s "controlled buy" of April 15, 2003.

On May 7, 2004, the trial court sustained the prosecution's motion to consolidate indictment numbers 03–CR–00093 and 03–CR–00135. On July 29, 2004, indictment number 04–CR–00155 was also consolidated with the previous indictments. However, Appellant was acquitted on this last indictment.

Appellant was tried before the Jessamine Circuit Court on August 5–9, 2004. At trial, the main point of contention was the "chain of custody" for the drugs taken from the Appellant or his vehicle, which were presented in five separate packages, originally marked by the Nicholasville police as DU03027 (March 28, 2003 buy), DU03039 (April 15, 2003 buy), DU03043 (May 7, 2003 buy), DUO03044 (May 7, 2003 search of Penman vehicle) and DU03048 (May 31, 2003 search of Penman vehicle).

In fact, out of seven Commonwealth witnesses[3] used at trial, four witnesses' testimony—Jennifer Wininger, Heather Harris, Kathy Humphrey, and police officer Scott Harvey—were devoted solely to questions involving the chain of custody of the drug packages. Two others, Detective Kevin Grimes and Officer Brian Travis, also touched upon the chain of custody, but

---

1. He was also indicted at that time as a persistent felony offender, second degree. However, that charge was defective and dismissed prior to trial.

2. Again, this indictment included a sentence-enhancing persistent felony offender, second

degree, which was later dismissed prior to trial as defective also.

3. At the close of the Commonwealth's case, the defense offered no witnesses and rested.

only to, and from, the NPD to the Kentucky State Police (KSP) crime lab.

In regard to the chain of custody, officers from the NPD established the chain of custody for the drug exhibits from either K.A.'s buys or the vehicles from which the two other amounts were taken—up through, to, and back—from the KSP crime lab. The weights of the separate packages of substances transferred to the KSP crime lab were established by the testimony of the officers as to four of the transfers and by the KSP request for examination form as to a fifth.

At the time of the transfer of the substances for testing, the KSP labs were overwhelmed. To "catch up," and avoid further delays, a plan was formulated by the lab to "outsource" the testing to other private testing firms. As the exhibits to be tested in this and other cases were numerous, it was determined by KSP that the transfer cost by registered mail would be prohibitive. It was then decided that transfer by Federal Express (FedEx) offered similar security with the tracking numbers so the package could be followed at any time to find out where it was.

National Medical Services Laboratories (NMS) of Pennsylvania was selected to test the substances in this case. At trial, KSP Forensic Drug Chemist, Jennifer Wininger, testified as to the transfer to and from NMS. She testified that she received the five packages of cocaine from the Nicholasville police officers on two dates, April 17, 2003 and June 25, 2003. She then marked each of the evidence items and assigned them a KSP control number. On October 27, 2003, she shipped all five packages to NMS via FedEx to be delivered on or before October 28, 2003. According to her, all five packages were shipped in a single box with a FedEx tracking number.

Heather Harris, the forensic chemist with NMS, testified she examined the drugs in this case and found that all tested positive as cocaine. She explained that when evidence comes in to NMS an evidence technician logs the evidence in and then assigns it an additional NMS number. The technician then stores it in a secure evidence vault until it is retrieved and tested by the forensic chemist, which in this case was Ms. Harris. Lab reports are then prepared on each of the samples reflecting the testing and, here, were testified to and filed in evidence by Ms. Harris. Once she finishes her analysis, she places them back into the secure storage in the evidence room. Then, at a later time, other technicians remove the evidence and return them to the referring agencies, in this case, KSP also by secured transfer through FedEx with an assigned tracking number.

NMS retains business files on all packages received and tested and these forms were filed by the Appellant (Defendant's exhibits 1 & 2) in the trial record through Ms. Harris. These forms show the flow of the package/sample from receipt through testing, to reshipment, back to the original source. Although it was documented that all five packages were sent to NMS and the actual test reports indicate that all five were tested at NMS—the police drug internal chain of custody forms prepared by NMS only disclose receipt of four of the five packages/samples. Ms. Harris testified, however, that all five were received, tested and sent back.

At trial, she specifically reviewed each of the five packages and noted their identification numbers, as well as her initials on the inside and outside of the package. No one else from NMS testified as to the handling of the packages/samples with NMS. The packages were then received

back by KSP and later transferred to the NPD and exhibited during the trial.

At trial, Ms. Wininger (from KSP labs), also reviewed the separate packages/samples and noted her initials from her original receipt prior to transfer to NMS, noted the various numbers assigned by KSP and NMS on the packages and noted they were still sealed and testified that there was no evidence that they had been tampered with.

In her testimony as to the handling of the separate packages/samples at the NMS labs, Ms. Harris noted that the five packages/samples had come in on two shipments on October 21, 2003 and October 28, 2003. This was contradictory to the testimony of Ms. Wininger, that they were all shipped in one box on October 27, 2003, to be delivered by October 28, 2003. However, upon further questioning, Ms. Harris did acknowledge that all the files contained only one FedEx document indicating one shipment date of October 28, 2003. Also, all the NMS tracking labels on the samples were dated 10/28/03.

During additional questioning, Ms. Harris testified that it was possible that all the packages/samples came in as one unit and when asked whether the dispute as to the time received could jeopardize the integrity of the packages/samples, she testified that it would not since the samples would not have been opened until she had

brought them back to her desk for testing and she then resealed them and put them back in the secure vault. This left one question in the evidence unresolved.

The package/sample from the March 28, 2003 buy was weighed in by the NPD at 14.9 grams including the containers. However, the weight noted by the NMS lab was 13.97 grams. The sample package from the April 1, 2003 buy was weighed in by the NPD at 15.5 grams, yet only 14.67 grams by the NMS lab. The May 7, 2003 buy was weighed in at 16.9 grams by NPD, yet only 11.74 grams by the NMS lab. The substance taken from the Appellant's vehicle as a result of the search on May 7, 2003, was weighed in at 212 grams by the NPD, yet only 109.118 grams by the NMS lab.[4] The sample package taken from the May 31, 2003 search of Appellant's vehicle was weighed in by the NPD at 31 grams, but only 29.51 grams by the NMS lab.[5]

Offering no witnesses, the defense argued and rested its case on the unreliability of the "chain of custody" and thus, its inadmissibility as subsequent proof that the substances taken from the Appellant were in fact cocaine.

## I. REFUSAL TO SUPPRESS THE COCAINE AND RESULTING LAB REPORTS

■ Several months before trial, the Appellant moved to suppress the drugs

---

4. NPD officers Grimes and Travis testified at trial that the total weight of the drugs, including the brown paper bag and the plastic bag was 212 grams, but when weighed without the plastic baggies, and the brown bag, the weight was 200 grams. As per protocol, they only removed a small amount for field testing.

5. The Commonwealth's theory on the missing cocaine was that the weight was different because the police weighed it with packaging, and the lab did not, and the scales were different. In fact, at the February 17, 2004, suppression hearing, Officers Harris and Tra-

vis did testify that they weighed them differently, one with the package and one without. Yet no one testified to this fact in front of the jury. Ms. Harris did testify that she tested the sample twice, but gave no expected weight loss other than to say that the field test would consume approximately a milligram. In one other instance, the evidence established that as to the May 7, 2003 buy, the NPD records indicate the cocaine was recovered in a baggie. That baggie never made it to the NMS labs, whose records indicate it was received in a folded piece of white paper.

and resulting lab reports on the basis of the disparity of weight between the NPD weights and the amount ultimately noted by the NMS lab for testing. The motion was heard on February 17, 2004, by the trial court, which entered a detailed order denying the Appellant's motion:

> Motion to suppress denied. Detective Kevin Grimes testified that their reported weight of the drugs seized includes the packaging. Heather Harris testified that the lab's weight excludes the packaging. The evidence reasonably explains the discrepancy between the police and lab weights. The drugs and resulting lab reports are admissible for each of the offenses. Any disparity between the Nicholasville Police Dept. weights and the lab weights goes to the weight of the evidence rather than its admissibility. There is a reasonable probability that the evidence has not been altered in any material respect.

Later the Appellant filed an additional *pro se* "motion to reconsider," which again was denied with the following order of the court:

> Denied. The proof at the hearing indicated that the substance in question has not been altered in any material aspect. *Mollette [v. Kentucky Personnel Bd.]*, 97 S.W.2d [sic] 492 ([Ky.App.]1999). The testimony indicated that the weight disparity was the result of the police *including* the containers and the lab *excluding* the containers in their measurements.

The motion was renewed just prior to the commencement of trial, and again the motion was denied.

KRE 1101(d) provides that the rules of evidence (other than privileges) do not apply to the determination of preliminary questions of fact when the issue is to be determined by the court under KRE 104. KRE 104(a) provides that preliminary questions concerning the admissibility of evidence shall be determined by the court. In making its determination, it is not bound by the rules of evidence, except privileges. As best we can determine from the record, including the court's order and the Appellant's motion, the suppression motions were premised upon the disparity in weight between the samples tendered and analyzed. At the hearing Detective Grimes, from the NPD, testified their reported weight included the packaging, whereas Ms. Harris testified NMS's weight excluded the packaging. Believing the evidence to reasonably explain the discrepancy, the court then denied Appellant's motion, noting that "the disparity between the [NPD]...weights and the lab weights goes to the weight of the evidence rather than its admissibility." The court also found that "there is a reasonable probability that the evidence had not been altered in any material respect."

■ The court was correct in its analysis. "Where the state's evidence otherwise establishes to a reasonable probability that the substances introduced at trial are the same as the substance seized, a discrepancy in the weight of the substances goes to the credibility of the evidence, not its admissibility." *Hancock v. State,* 587 So.2d 1040, 1045 (Ala.Crim.App.1991) (noting a two and a half pound discrepancy); *see also, United States v. Stanley,* 24 F.3d 1314 (11th Cir.1994) (noting that officers weigh cocaine at 105.6 grams, lab at 88 grams); *United States v. Mitchell,* 796 F.Supp. 13 (D.D.C.1992) (noting officers weighed at 30 grams, lab at 19.33 grams—chemist was asked about discrepancy at the motion hearing and stated difficult to establish the cause of weight difference with any certainty); *People v. Anderson,* 837 P.2d 293 (Colo.App.1992) (noting 500.1 grams by officers, 476 at lab—testimony at motion hearing indicated discrepancy was

result of weighing with and without wrappings and court stated "we fail to see how any so-called discrepancy in the weight of the cocaine, even if unexplained, could be exculpatory.").

There being no abuse of discretion, *Partin v. Commonwealth*, 918 S.W.2d 219 (Ky. 1996), we find no error in the court's ruling at the suppression hearing.

## II. *THE ADMISSIBILITY OF THE DRUG ANALYSIS AT TRIAL*

■ When the Commonwealth moved to introduce the cocaine exhibits into evidence, the Appellant again objected on the grounds (1) that the Commonwealth had not established a proper chain of custody (i.e., there was a reasonable probability the cocaine was altered in a material fashion) and (2) that no witnesses testified as to FedEx's handling of the shipments between KSP and NMS. This objection was overruled.

■ A trial court's decision as to whether an item of evidence is in essentially the same condition as it was at the time of the crime and, therefore, whether a sufficient foundation was laid is reviewable under an abuse of discretion standard. *Thomas v. Commonwealth*, 153 S.W.3d 772 (Ky.2004). "The requirement of . . . identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." KRE 901(a).

> Logically, a proper foundation requires the proponent to prove that the proffered evidence was the same evidence actually involved in the event in question and that it remains materially unchanged from the time of the event until its admission. The necessary foundation depends upon the nature of the evidence. Evidence readily identifiable and impervious to change may be admitted solely on testimony that it appears to be the actual object in an unchanged condition. However, the more fungible the evidence, the more significant its condition, or the higher its susceptibility to change, the more elaborate the foundation must be.

*Thomas*, 153 S.W.3d at 779.

> Even with respect to substances which are not clearly identifiable or distinguishable, it is unnecessary to establish a perfect chain of custody or eliminate all possibility of tampering or misidentification, so long as there is persuasive evidence that the reasonable probability is that the evidence has not been altered in any material respect. Gaps in the chain normally go to the weight of the evidence rather than to its admissibility.

*Rabovsky v. Commonwealth*, 973 S.W.2d 6, 8 (Ky.1998).

"All possibility of tampering does not have to be negated. It is sufficient . . . that the actions taken to preserve the integrity of the evidence are reasonable under the circumstances." *Thomas*, 153 S.W.3d at 778.

There is nothing present in this case which rises to a probability that the cocaine admitted into evidence at the trial was not the cocaine acquired in the "controlled buys," or the vehicle searches conducted by the NPD. Admittedly, there are variances in weight. However, the testimony at the suppression hearings established to the court's satisfaction and it so found, that the variances were explained by the differences in the weighing techniques. Ms. Harris testified she weighed without the wrappings or containers, whereas the NPD basically weighed with the containment material. Additionally, evidence was given that the materials were subjected to three tests—a field test by the NPD and an initial test and a subse-

quent test by the NMS labs—thus, it is reasonable to believe additional substances were consumed in these tests.[6] That being said, the mere possibility that someone, somewhere, "pinched" some of the cocaine is insufficient to prove the actual substances taken from Appellant were not accurately analyzed as to what remained.

Officers who participated in the "controlled buys" and the searches testified to the events and circumstances of such. The location from which each item of evidence was recovered was identified. The manner in which each item was tagged for identification was described, both for the officers, the KSP lab and the NMS lab. The manner in which the evidence was secured at the NPD, the KSP lab and the NMS lab was explained, as was the testing. And along with the testimony, appropriate "chain of custody" documents from the KSP lab and the NMS lab detailing the security and transfer steps within and between the labs were filed as exhibits for perusal and review. Both Ms. Wininger and Ms. Harris, from their respective KSP and NMS labs, testified as to their lab's handling of the materials, the restrictions on who could open and handle the materials, and the documentation of their initials on the packages/samples introduced. In fact, Ms. Wininger noted her initials both on the inside and the outside of the packages along with those of NMS. Both testified, upon review of the exhibits that there appeared to be no tampering, even during the transfer by the secured tracking method used by FedEx. Moreover, it was noted that the use of FedEx under these unusual circumstances offered similar security assurances as are normally employed by the KSP labs and that the "outsourcing" of the sampling of these exhibits

was necessitated by the tremendous backlog and a desire to accelerate the testing and avoid further trial delays in Kentucky, which had been the subject of several articles in regard to the KSP lab in earlier parts of the year. All of these steps and witnesses were subject to cross-examination. In fact, this was the sole defense put on by the Appellant, and it was grueling.

■ "Where the ... evidence otherwise establishes to a reasonable probability that the substance introduced at trial is the same as the substance seized, discrepancies in the weight of the substance go to the credibility of the evidence, not its admissibility." *Hancock v. State*, 587 So.2d 1040, 1046 (Ala.Crim.App.1991). Decisions concerning the admissibility of evidence are not required to meet the higher burden of "beyond a reasonable doubt" for verdicts; rather the standard for admissibility is a preponderance. *Lego v. Twomey*, 404 U.S. 477, 488–89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Thus, the evidentiary standard is unrelated to the burden of proof on the substantive issue. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Plainly, "the adequacy of the chain of custody was a factual question, the jury resolved against the Appellant." *United States v. Graham*, 464 F.2d 1073, 1076 (5th Cir. 1972).

■ "It is unnecessary ... that the police account for every hand-to-hand transfer of the items; it is sufficient if the evidence demonstrates a reasonable assurance the condition of the item remains the same from the time it was obtained, until its introduction at trial." *State v. Price*, 731 S.W.2d 287, 290 (Mo.Ct.App.1987). In

---

**6.** However, evidence of the different weighing techniques between the NPD and NMS was not introduced for consideration by the jury, although we do note that the officers and Ms.

Harris testified to these differences before the trial court in the suppression hearings. However, the jury was aware of the consumption aspect of the testing.

*Love v. Commonwealth,* 55 S.W.3d 816 (Ky.2001), we upheld the validity of a chain of custody where the technician who centrifuged the sample was not called as a witness. However, there was other persuasive evidence in the case to indicate the sample remained sealed during the centrifuge process. In this instance there is "persuasive evidence" that only the officers involved in the buys and seizures and the lab technicians at both KSP and NMS ever handled the material in an unsealed manner, or had the ability to. The evidence supported the belief that the samples remained sealed at all other times.

Consequently, the reasonable probability is that the evidence at issue has not been tampered with or changed in any fashion. *Muncy v. Commonwealth,* 132 S.W.3d 845, 849 (Ky.2004). Having examined the record, we believe that the chain of custody was sufficiently established under these circumstances.

### III. *FAILURE TO GRANT A DIRECTED VERDICT OF ACQUITTAL IN THAT THE COMMONWEALTH FAILED TO PROVE THE CHAIN OF CUSTODY AND AUTHENTICATION OF THE COCAINE BEYOND A REASONABLE DOUBT*

 The Appellant also argues, on the same grounds as set out in issues I and II, that the trial court erred in not granting a directed verdict of acquittal after the Commonwealth failed to prove the chain of custody and identification of the cocaine beyond a reasonable doubt. Simply put, that is not the test. *See Lego* and *Bourjaily, supra.*

 The standard of review for a trial court, in ruling on a motion for directed verdict, is that the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth, and then determine if such evidence is sufficient to induce a reasonable jury to believe beyond a reasonable doubt that the Defendant is guilty. *Thompson v. Commonwealth,* 147 S.W.3d 22 (Ky.2004). The test on appellate review "is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

A review of the evidence presented in this case clearly indicates that the trial judge correctly determined that a reasonable juror could reasonably find guilt beyond a reasonable doubt.

### IV. *THE RCr 7.24 VIOLATIONS*

The Appellant also argues that the court erred in allowing the introduction of various documents related to the "chain of custody" of the illegal substance, for reasons that the documents had not been provided to the Appellant pursuant to RCr 7.24. The documents objected to, are contained in Commonwealth exhibits 8 and 14. Exhibit 8 shows a FedEx tracking form for the packages from NMS back to the KSP labs, the request for examination forms by the NPD to KSP lab and the record of evidence release forms from KSP labs back to NPD. Exhibit 14 includes the internal evidence and property control document for the illegal substances while in the possession of the NPD, the request for examination by KSP lab and the record of evidence released to KSP lab for each of the separate packages. All of the documents in question had been generated after the entry of the order of discovery and the initial compliance therewith by the Commonwealth.

The Appellant was arraigned on the initial charges on July 15, 2003. The order reflecting the arraignment, which appears to be a form order, ordered discovery under RCr 7.24 and 7.26:

Within 30 days of the entry of this Order, absent good cause shown, the Commonwealth shall provide to the Defendant's attorney or, if the Defendant is acting *pro se,* to the Defendant a copy of the discovery and disclosure authorized under RCr 7.24 and RCr 7.26, a copy of the tape (or transcript if available) of the grand jury testimony related to this Indictment, and any exculpatory material required by Due Process and applicable case law to be disclosed to the Defendant.

Upon the Commonwealth's compliance with this Order, the Defendant, subject to objection for cause, shall within 15 days provide to the Commonwealth the reciprocal discovery and disclosure authorized under RCr 7.24(3)(A).

This is a continuing discovery order. Any materials that are discoverable under the above paragraphs which come into possession, custody or control of the party required to provide them, shall be promptly provided to the other party's attorney.

Thereafter, on July 17, 2003, the Department of Public Advocacy entered its appearance through counsel as Appellant's attorney. The only chain of custody documents that existed at this time were the internal logs that the NPD established in the transfer of the alleged illegal substances to its secure evidence locker. The Appellant acknowledges that he received this discovery from the Commonwealth at the time, but objects because he did not receive the subsequently created documentation, which was created as the materials were later transferred from NPD to KSP and then back from KSP to the NPD. No objection is made to the NMS documents, which also were not provided, but Appellant introduced those himself as Defendant's exhibits 1 and 2 and does not complain thereof.

However, it is undisputed that the Appellant received, through subsequent discovery from the Commonwealth, all the reports of the forensic laboratory examinations ultimately conducted on the substances. These reports from NMS document the NMS control numbers, the KSP laboratory number, disclose the results analysis, state "that all chain of custody documents were in order," and that "the chain of custody documentation is on file at National Medical Services Inc."—the address of which is contained on the report, as well as the phone number. The reports are dated November 5–6, 2003.

Subsequent thereto, the Appellant filed a Motion for Bill of Particulars on November 12, 2003, and a subsequent Motion to Suppress "the drugs and resulting lab reports," attaching thereto the copies of the reports of the substance analyses from NMS. The copies attached have a facsimile (fax) date of December 12, 2003. In fact, the parties and the court had discussed having the suppression hearing on the 17th of February at the court hearing on January 29, 2004, along with the necessity of having Ms. Harris, the NMS lab technician who did the analysis, appear and testify in regards thereto. The hearing was held, and Ms. Harris, along with Detective Grimes of the NPD, appeared and testified to the reasons for the differences in the weights of the various samples/packages. Thereafter, the court denied the motions to suppress, noting, "any disparity between the NPD weights and lab weights goes to the weight of the evidence rather than its admissibility. There is a reasonable probability that the evidence has not been altered in any material respect."

Thereafter on March 2, 2004, the Appellate wrote a pro se letter to the court, objecting to the court's ruling on the suppression motion and noted "the NPD detectives & the lab testimony on record will

suffice, I just need to show the court that the evidentiary material the police recovered was undocumented for a total of 82 days until the laboratory received it from a courier coupled with inconsistent weight measurements." Although we do not have a video tape of the examinations conducted during the suppression hearings, it is only fair to assume that Ms. Harris appeared and testified at the hearing with the NMS file containing all documents connected with the separate samples/substances.[7]

Further, on the morning of trial, Appellant filed two additional motions, one to suppress results of the vehicle search and another to suppress hearsay statements from his cellular telephone (cell phone), which at the time of the call objected to, was in the possession of the NDP. Thus, although it appears the Commonwealth did not supplement its initial disclosure with the chain of custody documentation created by the transfers for analysis, other than the analysis reports themselves, neither did the Appellant request further compliance even though it was obvious that transfer documents were in existence, the existence of which was disclosed on the face of the reports of the analysis.

RCr 7.24(9) provides:

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or an order issued pursuant thereto, the court may direct such party to permit discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing into evidence the material not disclosed, or it may enter such other orders may be just under the circumstances.

■■■ The standard of review in these matters is an abuse of discretion. *Beaty v. Commonwealth*, 125 S.W.3d 196, 202 (Ky. 2003). Although the Appellant argues the violation is of RCr 7.24(1), this section only pertains to statements or confessions of a defendant and results of physical or mental examinations and/or scientific tests or experiments. The reports of analysis results were given to the Appellant and no complaints made thereof. This is more properly an argument made under RCr 7.24(2), which requires a "motion of a defendant" after which the court "may order" disclosure—which then triggers a corresponding obligation upon the defendant to disclose his tangible exhibits—if he so elected. Noting that no such request appears in the record, it is arguable that the court should not utilize a form order, such as it did here on arraignment, for reasons that it infringes upon the election given the defendant under RCr 7.24(2) and 3A(ii). That having been said, "[n]evertheless, the order was valid until overruled." *Hodge v. Commonwealth*, 17 S.W.3d 824, 849 (Ky.2000). Moreover, whether the failure to provide the discovery is inadvertent, or intentional, is immaterial. *Anderson v. Commonwealth*, 864 S.W.2d 909, 914 (Ky.1993).

Here, as noted however, the court was entitled to enter such an order as it felt was "just under the circumstances." Appellant's counsel requested no recess, or

---

7. The briefs disclosed that the clerk's office could not find the hearing tapes for this hearing since it was conducted during the lunch hour break of another trial ongoing during February 2004. However, the trial tapes show that Ms. Harris appeared at trial with her file and the records, and the targeted questioning by the defense indicates that Appellant's counsel knew what discrepancies could be found within her file at that time. Moreover, it was the Appellant who introduced documents, other than the reports, from Ms. Harris's NMS file as defendant's exhibit 1 and 2, which also disclosed the FedEx priority overnight tracking materials.

other relief, other than a bar to their introduction, notwithstanding that the witness involved had testified orally as to the transfers, receipt and handling of the exhibits/samples to which the documentation pertained. Moreover, Appellant's counsel was candid upon inquiry from the court that he didn't know what he could have done with them had he seen them. Plainly, the Commonwealth's Attorney violated the order, which was valid until rescinded; however, under the circumstances of this case and within the discretion allowed the trial court under RCr 7.24(9), we find no abuse of discretion in this instance by the court. The court did what it thought was just "under the circumstances" and we don't disagree.

▇▇▇ Moreover, the error is harmless where, considering the entire case, the substantial rights of the Defendant are not affected and there appears to be no likely possibility that the result would have been different had the error not occurred. *Scott v. Commonwealth*, 495 S.W.2d 800, 801–02 (Ky.1972). Thus, had we found error here on the part of the trial court, it would have been harmless.

### V. *THE SEIZURE OF COCAINE FROM THE APPELLANT'S VEHICLE ON MAY 7, 2003*

▇▇▇ After the last "controlled buy" from the Appellant on May 7, 2003, the NPD made a decision to arrest the Appellant. The officers then located him and followed him for sometime, then stopped him. He was ordered out of the car, but fled and was arrested almost a block away. The vehicle from which he fled was the same Ford Expedition that he had been driving in connection with the drug transactions of March 28 and April 15, 2003. Once he was arrested, his Expedition was searched and a large amount of cocaine was found in the center console. Appellant now contends the search was improper since he was almost a block away from the vehicle when arrested.

In *Thornton v. United States*, 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004), the Supreme Court held that an officer can search the passenger compartment of a vehicle incident to a lawful arrest of a "recent occupant." In acknowledging this rule to be a natural extension of *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the Supreme Court held that the "*Belton* Rule" applied even when the officer made initial contact with the arrestee after the arrestee had left the vehicle. *Thornton*, 541 U.S. at 623–24, 124 S.Ct. at 2132. The Appellant here makes the same argument as was made in *Thornton* and *Belton*, to the effect that the right to search the vehicle terminates once the arrestee no longer has access to the vehicle in order to access weapons or effect destruction of evidence.

> [U]nder the strictures of petitioner's proposed "contact initiation" rule, officers who do so will be unable to search the cars passenger compartment in the event of a custodial arrest, potentially compromising their safety and placing incriminating evidence at risk of concealment or destruction. The Fourth Amendment does not require such a gamble.

*Thornton*, 541 U.S. at 621–22, 124 S.Ct. at 2131.

▇▇▇ Moreover, "the right to search an item incident to arrest exists even if that item is no longer accessible to the defendant at the time of the search. So long as the defendant had the item within his immediate control near the time of his arrest, the item remains subject to search incident to an arrest." *United States v. White*, 131 Fed.Appx. 54, 58 (6th Cir.2005) (quoting *Northrop v. Trippett*, 265 F.3d 372, 379

(6th Cir.2001)). As many commentators have noted, the rule under *Belton* and *Thornton* is no longer based upon the fact that the arrestee might grab a weapon or evidentiary item from his car. Myron Moskovitz, *A Rule in Search of a Reason: An Empirical Re-examination of Chimel and Belton* 2002 Wis. L.Rev. 657, 675; David M. Silk, *When Bright Lines Break Down: Limiting New York v. Belton* 136 U. Pa. L.Rev. 281, 290–291. The Appellant, however, having fled the vehicle immediately prior to this arrest, qualifies as a "recent occupant" thereof under *Thornton.*

Moreover, in *Clark v. Commonwealth,* 868 S.W.2d 101, 107 (Ky.App.1993), it was stated that searches incident to legal arrest "provide, in relation to automobiles, that where there is probable cause to support a custodial arrest, that same probable cause justifies a search of the entire automobile passenger compartment." (Citing *Commonwealth v. Ramsey,* 744 S.W.2d 418, 419 (Ky.1987); *New York v. Belton,* 453 U.S. 454, 460–63, 101 S.Ct. 2860, 2864–66, 69 L.Ed.2d 768 (1981)).

■ In light of the criminal conduct observed by the officers concerning Appellant over the weeks before his arrest, the fact that Appellant's vehicle was an instrumental part of the drug transactions and was the actual location of the March 28, 2003 sale, coupled with the fact that the officers were there to arrest Appellant, sufficient justification existed for searching Appellant's vehicle at the time of the arrest.

Thus, the arrest and search of the Appellant's vehicle under these circumstances was proper, notwithstanding that he fled the vehicle, and the trial court properly ruled that the evidence seized should not be suppressed. Thus, we find no error.

## VI. *THE JUROR CHALLENGES*

■ The Appellant objected to juror 448 for cause, and when this challenge was overruled, the Appellant utilized a peremptory challenge to remove juror 448 from the jury. Thus, Appellant argues error under *Marsch v. Commonwealth,* 743 S.W.2d 830 (Ky.1988) and *Thomas v. Commonwealth,* 864 S.W.2d 252 (Ky.1993), overruled by *Morgan v. Commonwealth,* 189 S.W.3d 99 (Ky.2006).

In response to a voir dire question about ties to law enforcement, juror 448 noted that her husband was a retired police officer, and thus she was "very pro-police." However, she also stated she would like to think that she would be honest and listen to the information. When asked if she would put more weight on a police officer's testimony over a lay person's testimony, she answered that she "would hope not," she "would try not to," that she "wouldn't intentionally," that she would "listen and do my very best" to be impartial and "listen to the information."

It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed.... Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine the competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.

*Patton v. Yount,* 467 U.S. 1025, 1039, 104 S.Ct. 2885, 2893, 81 L.Ed.2d 847 (1984).

 Under RCr 9.36, the trial judge is to determine that when there are reasonable grounds to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified. The decision of whether to excuse for cause is within the sound discretion of the trial judge. *Caldwell v. Commonwealth,* 634 S.W.2d 405, 406 (Ky.1982); *Pennington v. Commonwealth,* 455 S.W.2d 530, 532 (Ky.1970).

Although the Appellant has focused on answers to questions where juror 448 indicated that essentially she hopes she would be a good juror, she was asked and gave answers or indications of answers to many more questions, one of which was essentially whether or not she could be fair and impartial in her application of the facts to the law and follow the instructions given by the court in this case.

 It has also been held that a juror is qualified to serve unless there is a showing of bias, *Polk v. Commonwealth,* 574 S.W.2d 335, 336–37 (Ky.App.1978), but it is incumbent upon the party claiming bias or partiality to prove the point. *Polk,* 574 S.W.2d at 337; *Hicks v. Commonwealth,* 805 S.W.2d 144, 147 (Ky.App.1990). However, deference must be paid to the trial judge, who sees and hears the juror, in reviewing determinations of impropriety of challenges for cause. *Wainwright v. Witt,* 469 U.S. 412, 428–30, 105 S.Ct. 844, 854–55, 83 L.Ed.2d 841 (1985).

In Kentucky, even law enforcement personnel are not automatically excluded from the jury panel. *Sholler v. Commonwealth,* 969 S.W.2d 706, 708–09 (Ky.1998); *Mabe v. Commonwealth,* 884 S.W.2d 668, 671 (Ky. 1994); *Bowling v. Commonwealth,* 942 S.W.2d 293, 299 (Ky.1997).

Here, although juror 448 did indicate that she was married to a retired police officer and that, as such, she was pro-police—one would never get the impression from listening to her whole testimony that she meant to indicate that she would, in any way, be pro-police sitting as a juror in this case. In fact, she indicated that she would listen to the evidence and do her very best to be impartial since she knew people made mistakes. Thus, in the context in which the statement was made, she acknowledged that anybody can be wrong in his or her testimony. This was a fair answer.

Giving due deference to the trial court, who not only heard the statements, but viewed the juror's demeanor in her response to questions asked by Appellant's counsel, we cannot say there was an abuse of discretion. Therefore, we find no error.

Furthermore, juror 448 did not sit in this trial. Even if the trial court's ruling, which resulted in Appellant having to use a peremptory strike to remove this juror, would have been error in the past under *Thomas, supra,* we would find no error today, since we specifically overruled *Thomas* to this effect in *Morgan v. Commonwealth,* 189 S.W.3d 99 (Ky.2006). The trial court is thus affirmed.

## VII. *JOINDER OF ALL THE INDICTMENTS*

 The Appellant also argues error in the joinder of indictment numbers 03–CR–00093, 03–CR–00135 and 04–CR–00155.

Indictment No. 03–CR–00093 included the indictments for the "controlled buys" of March 28, 2003, April 15, 2003, and May 7, 2003, along with the cocaine seized from the Appellant's vehicle on May 7, 2003, upon his arrest for the "controlled buys." Indictment No. 03–CR–00135 was for the cocaine found in the Appellant's vehicle when he was subsequently re-arrested af-

ter the issuance of indictment number 03–CR–00093. Indictment No. 04–CR–00155 was an additional trafficking transaction that actually occurred and was audiotaped during the "controlled buy" at Appellant's record store on April 15, 2003. During this instance, a male came into the record store while the "controlled buy" was in progress and traded the Appellant a handgun for cocaine.

Pursuant to motions by the Commonwealth to consolidate 03–CR–00135 and 03–CR–00093 filed May 3, 2004, the court ordered a consolidation of the two indictments by order dated May 20, 2004, noting:

> Count one of 03–CR–00135, alleges trafficking in a controlled substance first degree (cocaine) on 3–31–03. Counts one through four of 03–CR–00093 all allege the same offense on 3–28–03, 4–15–03 and 5–7–03. The offenses are of 'the same or similar character' and are close enough in time that their relevance far outweighs any prejudicial effect. The consolidation is consistent with RCr 6.18 and RCr 9.12.

▆▆▆▆ Thereafter, on July 29, 2004, the Appellant was arraigned on the third indictment, 04–CR–00155, which as aforesaid, occurred during one of the previous charges. At arraignment of this charge, the Commonwealth orally moved to consolidate this indictment with the other two, and the oral motion was granted by the trial court. The trial date still remained August 5, 2004.[8] In any event, during the trial, the Appellant was acquitted of indictment number 04–CR–00155.

RCr 6.18 and RCr 9.12 are relevant to the problem. RCr 6.18 permits the join-

der of two or more offenses ... in the same indictment ... if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constitute parts of a common scheme or plan.

*Brown v. Commonwealth,* 458 S.W.2d 444, 447 (Ky.1970). "RCr 9.12 permits two or more indictments to be consolidated for trial together if the offenses could have been joined in a single indictment ...." *Id.* The trial judge has broad discretion in regards to joinder and the decision of the trial judge will not be overturned in the absence of a demonstration of a clear abuse of discretion. *Violett v. Commonwealth,* 907 S.W.2d 773, 775 (Ky.1995). It is not an abuse of discretion for a trial judge to join offenses into a joint trial where the evidence of each crime is simple, the offenses are closely related in time, and there is no demonstrably unreasonable prejudice shown to the defendant as a result of the consolidation. *Brown,* 458 S.W.2d at 447.

In *Brown,* the charges joined were that of armed robbery and escape from custody in one indictment and another armed robbery and carrying a concealed weapon in a second indictment. Therein the court noted that "even though such evidence of distinct crimes might not have been admissible in separate trials, the promotion of economy and efficiency in judicial administration by the avoidance of needless multiplicity of trials was not outweighed by any demonstrably unreasonable prejudice to the Defendant as a result of the consolidations." *Brown,* 458 S.W.2d at 447.

▆▆▆▆ In *Violett,* the indictment charging the Defendant with sodomy of

---

8. The Appellant makes no allegations that he was not aware of the underlying facts involved in this allegation, as the transaction was contained within the audiotape of the controlled buy made on that day. Appellant did not suggest that he was not given a copy of that audiotape pursuant to the discovery from indictment number 03–CR–00093, which dealt with the "controlled buys."

his step-daughter was joined with the indictment charging him with rape of his biological daughter, even though the offenses allegedly occurred four years apart. "A significant factor in determining whether joinder of offenses for trial is unduly prejudicial is whether evidence of one of the offenses would be admissible in a separate trial for the other offense." *Violett*, 907 S.W.2d at 775.

> [E]vidence of an independent crime "... is competent when it tends to establish identity, or knowledge of guilt, or intent or motive for the commission of the crime under trial, or malice, or when other offenses are so connected or interwoven with the one being tried that they cannot well be separated from it in the introduction of relevant testimony ...."

*Spencer v. Commonwealth*, 554 S.W.2d 355, 358 (Ky.1977) (citation omitted).

In the case here, the court had information concerning four buys with two additional instances of possession of cocaine, all involving the Appellant, and all occurring within an approximately 60–day time span. The charge made under 04–CR–00155 actually occurred during the commission of one of the "controlled buys" in 03–CR–00093 and was so inextricably intermingled with the other evidence to be introduced on the particular audiotape, as to be admissible itself.[9] And even the logistical considerations concerning the presentation of the proof was a factor, since an out-of-state chemist from NMS was used to test all the samples and had to be brought in personally to testify in all the charges. Thus, it was a simple and logical decision for the trial court to join these offenses for trial and the Appellant has not shown that the trial court abused its discretion in doing so, especially given the fact the Appellant was acquitted on 04–CR–00155. Thus, we find no abuse of discretion.

For the reasons set out above, we affirm the Appellant's conviction.

LAMBERT, C.J., GRAVES and WINTERSHEIMER, JJ., concur.

ROACH, J., concurs fully in I, II, III, IV, VI, and VII, but concurs in result only as to section V.

COOPER, J., concurs by separate opinion, with JOHNSTONE, J., joining this concurring opinion.

Concurring Opinion by Justice COOPER.

In *Thornton v. United States*, 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004), the United States Supreme Court essentially held that a search incident to a lawful arrest includes a search of any vehicle in which the arrested person was a "recent occupant." *Id.* at 623–24, 124 S.Ct. at 2132. In my view (and that of five members of the Court that decided *Thornton*), the reasoning supporting this departure from previously settled law with respect to automobile searches is seriously flawed. Nevertheless, *Thornton* is on all fours with the facts of this case. As I stated in my concurrence in *Rainey v. Commonwealth*, 2005–SC–0185–DG, 197 S.W.3d 89, 2006 WL 1360888 (Ky. May 18, 2006), because (and only because) I consider it important for law enforcement purposes that consistency be maintained between Kentucky and federal law on Fourth Amendment issues, I reluctantly concur in the majority opinion.

JOHNSTONE, J., joins this concurring opinion.

---

9. Even so, it was also admissible under KRE 404(b)(1).