# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: APRIL 30, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2019-SC-000233-MR

JOHN TABOR                                            APPELLANT

ON APPEAL FROM FRANKLIN CIRCUIT COURT
V.              HONORABLE THOMAS D. WINGATE, JUDGE
NOS. 17-CR-00121 AND 17-CR-00178

COMMONWEALTH OF KENTUCKY                  APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Denton "DJ" Bixler was the "on again-off again" boyfriend of John Tabor's daughter, Jennifer, and was the biological father to one of her children. On March 20, 2017, Tabor shot and killed DJ on the street in front of Tabor's home. Following a three-day trial, Tabor was found guilty of murder[1] and wanton endangerment in the first degree.[2] Prior to sentencing, Tabor moved the trial court to exempt him from serving eighty-five percent of his sentence pursuant to the domestic violence exemption contained in KRS 439.4301(5).

---

[1] Kentucky Revised Statutes (KRS) 507.020, a Capital offense.

[2] KRS 508.060, a Class D felony.

The trial court entered a written order denying the requested relief after convening a hearing on the motion. Tabor was subsequently sentenced to an aggregate term of twenty years' imprisonment. He now appeals, challenging only the trial court's ruling on the applicability of the domestic violence exemption. We affirm.

On the day of the shooting, Jennifer had driven her mother home from work. While she was at her parents' house, DJ arrived and wanted to speak with her, but Jennifer was on the phone. Tabor came down the long set of stairs from his home to the street to bring shoes and socks for his grandchildren who were waiting in Jennifer's car. Tabor believed there was tension between Jennifer and DJ. DJ drove away but returned a very short time later and began arguing with Jennifer over whether she was seeing someone else. The pair remained in the middle of the street. Jennifer described the argument as typical of their relationship and affirmatively stated DJ did not touch her or threaten her in any way.

During the argument, Tabor emerged from the house and told Jennifer and DJ to not argue in front of his house. Tabor and DJ exchanged a few harsh words filled with expletives and derogatory racial slurs. Tabor went back inside, only to reappear seconds later armed with a pistol. He again traversed the long set of stairs down the hill and confronted DJ, threatening to kill him. DJ asked Tabor if he was going to shoot him in front of his children, backing up with his hands in the air. Jennifer stepped between the two men and DJ moved her aside twice. As she was moved the second time, Tabor fired his

pistol, missing Jennifer by less than a foot and striking DJ in the face. Jennifer caught DJ before he hit the ground; he died before emergency services arrived. Tabor returned to his house after the shooting. During a subsequent interview with police, Tabor did not deny firing the fatal shot and conceded he did not observe DJ with a weapon.

At trial, the foregoing facts were undisputed. Further testimony revealed Tabor had previously contacted police on numerous occasions regarding his suspicions DJ was selling drugs and abusing Jennifer and his grandchildren. He stated he had seen drug transactions being conducted and had observed bruising on Jennifer's legs and ribs. Tabor stated his grandson had informed him DJ hit his mother. He believed Jennifer was afraid of DJ because she had obtained a taser and would often take steps to make it appear she was not at home so DJ would not come over. At one point, Tabor indicated to a local constable that if law enforcement would not do something, he would take matters into his own hands. However, none of Tabor's allegations were ever substantiated.

Testifying in his own defense, Tabor claimed he looked outside on the day of the shooting and saw DJ in Jennifer's face, slinging his arms around wildly and being extremely animated. He believed Jennifer was in fear of DJ. When he went to confront DJ, he did not draw his gun until DJ rushed him. DJ's actions led Tabor to believe he was armed. Tabor stated when DJ pushed Jennifer the second time, he lunged, causing Tabor to flinch and fire the gun. He was not expecting the gun to fire and did not intend to shoot DJ. The jury

ultimately disbelieved Tabor and convicted him of murder and wanton endangerment, recommending a total sentence of twenty years' imprisonment.

A hearing was convened on Tabor's post-conviction motion for application of the domestic violence exemption. Tabor and his wife were the only witnesses called at the hearing. Both reiterated their trial testimony, but neither was able to say Jennifer ever expressed fear of DJ or told them of any violence perpetrated by him. Neither had witnessed any incidents of domestic violence. In a lengthy written order, the trial court determined Tabor did not qualify for the exemption and subsequently sentenced him in conformity with the jury's recommendation. Tabor now challenges the trial court's decision, believing it to be clearly erroneous.

KRS 439.3401(3)(a) states "[a] violent offender who has been convicted of a capital offense . . . with a sentence of a term of years . . . shall not be released on probation or parole until he has served at least eighty-five percent (85%) of the sentence imposed." KRS 439.3401(5) contains an exception from the eighty-five percent rule: "[t]his section shall not apply to a person who has been determined by a court to have been a victim of domestic violence or abuse pursuant to KRS 533.060 with regard to the offenses involving the death of the victim or serious physical injury to the victim."[3] KRS 533.060(1) states

> [w]hen a person has been convicted of an offense or has entered a
> plea of guilty to an offense classified as a Class A, B, or C felony
> and the commission of the offense involved the use of a weapon
> from which a shot or projectile may be discharged that is readily

---

[3] The exception permits a defendant to be eligible for parole under the more lenient provisions of KRS 439.340.

capable of producing death or other serious physical injury, the person shall not be eligible for probation, shock probation, or conditional discharge, except when the person establishes that the person against whom the weapon was used had previously or was then engaged in an act or acts of domestic violence and abuse as defined in KRS 403.720 against either the person convicted or a family member as defined in KRS 403.720 of the person convicted. If the person convicted claims to be exempt from this statute because that person was the victim of domestic violence and abuse as defined in KRS 403.720, the trial judge shall conduct a hearing and make findings to determine the validity of the claim and applicability of this exemption. The findings of the court shall be noted in the final judgment.

Under the plain statutory language, to qualify for application of the exemption, a defendant "must have been a victim of domestic violence or abuse and that violence or abuse must also have occurred 'with regard to' the crime committed by the violent offender claiming the exemption." *Gaines v. Commonwealth*, 439 S.W.3d 160, 164 (Ky. 2014). A preponderance of the evidence standard is utilized for the first prong and we review these evidentiary determinations by trial courts for clear error. *Commonwealth v. Anderson*, 934 S.W.2d 276, 278 (Ky. 1996).

> With regard to the second prong of the test—whether domestic violence or abuse endured by a defendant occurred "with regard to the offenses" committed by that defendant—we have construed the statutory text to mean that the domestic violence exemption of KRS 439.3401(5) applies only when the domestic violence or abuse was "*involved*" in the offense committed by the violent offender. *See Springer v. Commonwealth*, 998 S.W.2d 439, 457 (Ky. 1999). In *Commonwealth v. Vincent*, 70 S.W.3d 422 (Ky. 2002), we further explained the evidence must establish "some connection or relationship between the domestic violence suffered by the defendant and the underlying offense committed by the defendant."[] *Id.* at 424. We further concluded that "a prior history of domestic violence between a violent crime victim and the criminal defendant who perpetrated the violent offense does not, in and of itself, make the defendant eligible for the parole exemption

of KRS 439.3401(5)."[] *Id.* at 425.

*Gaines*, 439 S.W.3d at 165.

At the conclusion of the evidentiary hearing, the trial court found Tabor had failed to show by a preponderance of the evidence that he "was more likely than not to have been a victim of domestic violence" or that domestic violence was "involved" in the offense committed by Tabor. We cannot conclude the trial court's findings were clearly erroneous.

During the hearing, Tabor provided nothing more than his suspicions DJ was abusing Jennifer and an uncorroborated statement attributed to his four-year-old grandson. He admitted never witnessing any incidents of domestic violence between DJ and Jennifer. Mrs. Tabor was likewise unable to say Jennifer had ever told her she was fearful of DJ or that he had abused her. No one observed physical threats or contact between the pair during the verbal altercation on the day of the shooting. At trial, Jennifer unequivocally denied having ever been abused or threatened by DJ, including on the day of his death. She stated her father was the aggressor prior to the shooting and she was not in imminent danger or fear of harm before Tabor fatally shot DJ. Weighing this and other conflicting evidence, the trial court concluded Tabor did not carry his burden of establishing he or Jennifer were victims of domestic violence. Although Tabor recounts testimony and evidence he believes established he and Jennifer were, in fact, victims of domestic violence and contends the trial court ignored this evidence, as trier of fact, the trial court has the right to "believe any witness in whole or in part. *Webb Transfer Lines,*

*Inc. v. Taylor*, Ky., 439 S.W.2d 88, 95 (1968). The trier of fact may take into consideration all the circumstances of the case, including the credibility of the witness. *Hayes v. Hayes*, Ky., 357 S.W.2d 863, 866 (1962)." *Anderson*, 934 S.W.2d at 278. Our review of the record reveals the trial court's ruling was based on the appropriate preponderance of the evidence standard and was not clearly erroneous.

Having failed to show he or Jennifer were victims of domestic violence, Tabor necessarily could not establish the requisite connection between any domestic violence and his shooting of DJ. His continued recitation of unsupported suspicions and beliefs is unavailing and simply does not render the trial court's decision infirm. Again, the trial court weighed the evidence and chose to disbelieve Tabor's self-serving assertions as was its right. There was no clear error.

For the foregoing reasons, the decision of the Franklin Circuit Court is AFFIRMED.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Kristin Leigh Conder
Assistant Attorney General